2003 SD 80

**Greg ROTH, Plaintiff and Appellee,**

- v.

**FARNER–BOCKEN COMPANY, Defendant and Appellant.**

No. 22384.

Supreme Court of South Dakota.

Argued Jan. 15, 2003.

Decided July 16, 2003.

Gregory J. Erlandson of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, South Dakota, Attorneys for plaintiff and appellee.

Jon C. Sogn, Thomas G. Fritz and Catherine M. Sabers of Lynn, Jackson, Shultz & Lebrun, Rapid City, South Dakota, Attorneys for defendant and appellant.

CALDWELL, Circuit Judge.

[¶ 1.] Greg Roth (Roth) brought claims of age discrimination and invasion of privacy against his former employer, Farner–Bocken Company (Farner). A jury returned a verdict finding in favor of Farner on Roth's age discrimination claim and a verdict in favor of Roth on the invasion of privacy claim. It awarded Roth $25,000 in compensatory damages and $500,000 in punitive damages. Farner appeals. We affirm in part, reverse in part and remand.

## FACTS AND PROCEDURE

[¶ 2.] Roth worked as a salesman for Vending Services, a separate Farner related corporation, in Sioux Falls, South Dakota from 1975 until approximately 1990. In 1990 Roth transferred as a sales manager to Farner–Bocken Centerville Company, another related corporation, located in Centerville, Iowa. While in Centerville, Roth experienced personal problems. He was drinking heavily, was charged with stalking, and was hospitalized and diagnosed with bipolar disorder. Roth also had problems with his relationships with customers and co-workers, and Farner eventually determined he could not remain in Centerville. Roth was rehired by Vending Services and was transferred to Rapid City, South Dakota to start up a new territory.

[¶ 3.] In this position, he was under the supervision of Gary Schmidt (Schmidt), whose office was located in Sioux Falls.[1] Roth, who had joined Alcoholics Anonymous, continued to have problems with co-workers and Farner continued to receive customer complaints. Ultimately, Farner determined that it would terminate Roth. On July 12, 1996, a meeting was scheduled between Roth, Schmidt and Cy Farner, part owner of Farner, at which Farner intended to terminate Roth's employment. Roth, who had previously had conversations with Cy Farner, in which Cy Farner indicated they were both getting too old for the business, anticipated termination and secretly tape recorded the meeting. After the meeting, in which Roth was indeed terminated, Cy Farner handed Roth an airplane ticket to Rapid City, $20 and requested that Roth return the keys to the company car.

1. Roth had previously worked with Schmidt in Sioux Falls. Roth testified that sometime after Schmidt began working for Farner in 1980, Roth and Schmidt were drinking quite a bit at a party at Roth's home and the two had an altercation.

[¶ 4.] After his termination, Roth met with Attorney Rick Johnson of Gregory, South Dakota, to discuss the possibility of an age discrimination claim against Farner. Roth left a package with Johnson which contained the tape-recording, a transcript of his termination meeting, a hand-written document Roth had compiled regarding his background with the company and his experiences during the last six months of employment, hand-written notes documenting phone calls to Schmidt and Cy Farner, and copies of work week records and documents recording his sales. This package was reviewed by Attorney Stephanie Pochop (Pochop) of Johnson's office. Pochop determined that she was unable to take Roth's case, drafted a letter advising Roth of this, and returned the package to him with the letter in a large mailing envelope. However, due to a clerical error, both the letter and the package were mailed to Roth at Vending Services' Sioux Falls address.

[¶ 5.] Schmidt received the package and testified at trial that he opened it in the regular course of business. However, after opening the package, Schmidt testified that he realized the transcript it contained was of a recording of the termination meeting. Schmidt then photocopied the entire contents of the package, including Pochop's letter, and forwarded the photocopies to Farner's Vice President of Sales, Dean Onken, who forwarded them to Farner's President, John Norgaard. Schmidt then removed the No.10 business envelope bearing Pochop's law firm's address from the original mailing envelope and attached it to a new mailing envelope. Over the original mailing address which listed Vending Service's Sioux Falls address, Schmidt pasted a type-written label

bearing Roth's home address. Schmidt testified he then dropped this package in the mail to Roth.

[¶ 6.] Sometime in 1998, Vending Services and many other separate Farner related corporations combined, merging into one surviving corporation named Farner–Bocken Company. In August 1998, Roth filed a lawsuit alleging age discrimination against Farner. During the discovery process, Roth obtained his personnel file from Farner.[2] In that file, Roth discovered copies of the documents he left with Attorney Johnson. Additionally, the file also contained a letter concerning Roth's age discrimination claim against Farner from Attorney Johnson addressed to an attorney in West Des Moines, Iowa with a notation that a carbon copy was sent to Roth. On April 12, 2000, Roth amended his complaint to include an invasion of privacy claim.

[¶ 7.] The jury returned a verdict on behalf of Farner on Roth's age discrimination claim, but found for Roth on his invasion of privacy claim. After the verdict was filed, Farner filed a motion for judgment n.o.v., or alternatively, motion for new trial or remittitur. These alternative motions were denied. Farner appeals.

## STANDARD OF REVIEW

[¶ 8.] A trial court's rulings on a motion for directed verdict and judgment notwithstanding the verdict are reviewed under the following standard:

> A motion for directed verdict under SDCL 15-6-50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial

---

**2.** Roth requested a copy of his personnel file soon after his termination and was told it did not exist.

evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

A motion for judgment n.o.v. is based on and relates back to a directed verdict motion made at the close of all the evidence. SDCL 15–6–50(b). Thus, the grounds asserted in support of the directed verdict motion are brought before the trial court for a second review. We review the testimony and evidence in a light most favorable to the verdict or the nonmoving party, then without weighing the evidence [we] must decide if there is evidence which would have supported or did support a verdict[.]

*In re Estate of Holan*, 2001 SD 6, ¶ 9, 621 N.W.2d 588, 590–91 (quoting *Bland v. Davison County*, 1997 SD 92, ¶ 26, 566 N.W.2d 452, 460) (citation omitted).

 [¶ 9.] Our standard of review on a motion for a new trial is well established:

Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion. If the trial court finds an injustice has been done by the jury's verdict, the remedy lies in granting a new trial. We determine that an abuse of discretion occurred only if no judicial mind, in view of the law and circumstances of the particular case could reasonably have reached such a conclusion.

*Biegler v. American Family Mutual Ins. Co.*, 2001 SD 13, ¶ 17, 621 N.W.2d 592, 598

(quoting *Schuldies v. Millar*, 1996 SD 120, ¶ 8, 555 N.W.2d 90, 95).

 [¶ 10.] "[A] jury's verdict should not be set aside 'except in extreme cases where it is the result of passion or prejudice or the jury has palpably mistaken the rules of law." *Biegler*, 2001 SD 13 at ¶ 32, 621 N.W.2d at 601, (quoting *Stoltz v. Stonecypher*, 336 N.W.2d 654, 657 (S.D. 1983)). "A verdict should only be set aside if the jury's conclusion was unreasonable and a clear illustration of its failure to impartially apply 'the reasoning faculty on the facts before them.'" *Biegler*, 2001 SD 13 at ¶ 32, 621 N.W.2d at 601, (quoting *Lewis v. Storms*, 290 N.W.2d 494, 497 (S.D.1980)) (additional citations omitted).

## ANALYSIS AND DECISION

### ISSUE ONE

[¶ 11.] **Whether the trial court erred in denying Farner's motions for directed verdict and judgment notwithstanding the verdict.**

A. Sufficiency of evidence supporting fraudulent concealment

[¶ 12.] At the end of Roth's case-in-chief, and again at the end of trial, Farner moved the court for a directed verdict on Roth's invasion of privacy claim. The court denied Farner's motions and Roth's invasion of privacy claim was submitted to the jury who rendered a verdict in favor of Roth. Farner then filed a motion for judgment n.o.v., or alternatively, motion for new trial or remittitur. These alternative motions were denied and judgment was entered on the jury's verdict.

[¶ 13.] The statute of limitations on a claim of invasion of privacy is three years. *See* SDCL 15–2–14. However, the jury found, and the trial court agreed, that Farner fraudulently concealed its invasion of Roth's privacy and the statute was tolled.

[¶ 14.] "Fraudulent concealment tolls the statute of limitations until the claim is discovered or might have been discovered with reasonable diligence." *Strassburg v. Citizens State Bank,* 1998 SD 72, ¶ 14, 581 N.W.2d 510, 515 (citations omitted). Fraudulent concealment applies "when actionable conduct or injury has been concealed by deceptive act or artifice." *Id.* Absent a confidential or fiduciary relationship, fraudulent concealment consists of "some affirmative act or conduct on the part of the defendant designed to prevent, and which does prevent, the discovery of the cause of action." *Id.* (quoting *Koenig v. Lambert,* 527 N.W.2d 903, 905–06 (S.D.1995) (overruled on other grounds)).

[¶ 15.] Nothing in the record indicates a confidential or fiduciary relationship. Therefore, Roth must show 1) that Farner took affirmative steps to prevent discovery of Roth's claim or its underlying facts; and 2) that Roth exercised diligence to discover the cause of action. *See Strassburg,* 1998 SD 72 at ¶ 15, 581 N.W.2d at 515.

[¶ 16.] In this case, there was testimony that the No. 10 business-size envelope bearing the law firm's address was removed from the original mailing envelope and attached to a new plain mailing envelope. Additionally, a label bearing Roth's home address was typed and pasted over Farner's address on the original No. 10 envelope. There was also evidence that the law firm sent a second letter to Roth at Farner's address, a photocopy of which was later discovered in Roth's personnel file. This constitutes competent and substantial evidence that Farner engaged in an affirmative act or conduct designed to prevent discovery of Roth's invasion of privacy cause of action.

[¶ 17.] Farner contends that Roth had constructive notice of the fraudulent concealment and thus failed to exercise diligence in discovering his invasion of privacy claim. Farner argues that Roth testified that he noticed the Sioux Falls post mark on the new mailing envelope when he received it, and Pochop's letter inside the envelope still bore the address of Farner in Sioux Falls. Farner also argues that there was a gap between the time which Roth was advised by Pochop that she was returning his documents and the time Roth received the envelope posted by Farner. Therefore, Farner contends that Roth had notice of his invasion of privacy claim at the time it occurred and, as a result, cannot rely on Farner's fraudulent concealment to toll the statute of limitations.

[¶ 18.] Roth, however, testified that he did not notice the Farner address on Pochop's letter and that he was not aware that Farner had opened, read, photocopied, and disseminated his mail until Farner produced a copy of Roth's personnel file during discovery in his age discrimination claim. Furthermore, Roth testified that he had never seen the second letter the law firm sent to Roth at the Farner address until he received the copy of his personnel file. Based on this, there was sufficient evidence by which the jury could conclude that Roth acted with diligence in discovering his invasion of privacy claim.

**B. Sufficiency of evidence supporting jury's verdict on invasion of privacy claim**

[¶ 19.] To recover on an invasion of the right to privacy claim, a claimant must show an "unreasonable, unwarranted, serious and offensive intrusion upon the seclusion of another." *Kjerstad v. Ravellette Publications, Inc.,* 517 N.W.2d 419, 424 (S.D.1994) (citing *Baldwin v. First Nat'l Bank of Black Hills,* 362 N.W.2d 85, 88 (S.D.1985)). Furthermore, "[t]he invasion must be one which would

be offensive and objectionable to a reasonable man of ordinary sensibilities." *Montgomery Ward v. Shope*, 286 N.W.2d 806, 808 (S.D.1979) (citations omitted).

[¶ 20.] "In resolving sufficiency of evidence issues on appeal, this court should examine the record to determine only if there is competent and substantial evidence to support the verdict." *Kjerstad*, 517 N.W.2d at 424 (quoting *Holmes v. Wegman Oil Co.*, 492 N.W.2d 107, 111 (S.D.1992)). "All conflicts are resolved and all reasonable inferences are drawn in favor of the prevailing party." *Id.*

[¶ 21.] Although we have not addressed an invasion of privacy claim based on the opening and reading of personal mail, other jurisdictions have found that such a claim lies in an action for invasion of privacy. *See Birnbaum v. U.S.*, 588 F.2d 319, 326 (2d Cir.1978) (recognizing state law claim against a private person for intrusion of privacy based on opening and reading sealed mail); *Vernars v. Young*, 539 F.2d 966, 969 (3d Cir.1976) (recognizing cause of action and indicating private individuals have a "reasonable expectation that their personal mail will not be opened and read by unauthorized persons); and *Doe v. Kohn, Nast & Graf, P.C.*, 866 F.Supp. 190, 195–96 (E.D.Pa.1994)(indicating "[a]n employer is not authorized to open mail addressed to a person at his workplace that appears to be personal[,]" and reasonable minds could differ as to whether intrusion occurred when letters were opened, copied and retained) (citation omitted)).

[¶ 22.] In this case, there is sufficient evidence in the record indicating that reasonable minds could differ as to whether Farner had intruded upon Roth's seclusion, and the issue was properly submitted to the jury. Schmidt testified that after he opened the envelope addressed to Roth at Farner's business address, Schmidt realized it was from a law firm and meant for

Roth, personally. Yet, Schmidt read the entire contents of the packet, made photocopies and disseminated them to his superior at Farner. Additionally, there was circumstantial evidence that a second letter from the same law firm addressed to Roth at Farner's business address was opened, read, photocopied and disseminated at Farner.

[¶ 23.] Therefore, there was competent and substantial evidence upon which a jury could find Farner liable for invading Roth's privacy.

### ISSUE TWO

[¶ 24.] **Whether the trial court erred in denying Farner's motion for a new trial.**

C. Sufficiency of evidence supporting compensatory damages

[¶ 25.] Farner contends that there was insufficient evidence to support an award of compensatory damages and that the award of $25,000 was excessive, arbitrary and a result of passion or prejudice and not supported by the evidence. Farner claims that the trial court erred in denying its motion for judgment n.o.v., its motion for a new trial and alternatively argues that the compensatory damage award should be remitted. When considering whether a jury verdict is sustained by the evidence:

> [W]e are not to speculate or query how we would have viewed the evidence and testimony, or what verdict we would have rendered had we been the jury. The real and only question to be solved and answered is, *Is there any legal evidence upon which the verdict can properly be based, and the conclusions embraced in and covered by it be fairly reached?*

*Biegler,* 2001 SD 13 at ¶ 32, 621 N.W.2d at 602 (quoting *Bakker v. Irvine,* 519 N.W.2d 41, 49 (S.D.1994) (emphasis in original)).

[¶ 26.] Generally, "[t]he amount of damages to be awarded is a factual issue to be determined by the trier of fact." *Estate of Pamela He Crow,* 494 N.W.2d 186, 192 (S.D.1992). However, "[a]n award of compensatory damages must not be the product of passion and prejudice and must be supported by the evidence." *Engels v. Ranger Bar, Inc.,* 2000 SD 1, ¶ 30, 604 N.W.2d 241, 247. The test for determining if the jury verdict is the product of passion or prejudice is:

> The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption.

*Stormo v. Strong,* 469 N.W.2d 816, 826 (S.D.1991) (quoting *Schuler v. City of Mobridge,* 44 S.D. 488, 184 N.W. 281, 283 (1921) (citations omitted)). We review the issue on appeal under the clearly erroneous standard. *He Crow,* 494 N.W.2d at 192 (citation omitted).

[¶ 27.] In *Kjerstad,* 517 N.W.2d at 424–25 we indicated there was competent evidence to support an award for compensatory damages on an invasion of privacy claim when the record reflected evidence that the plaintiffs had suffered both physical and emotional reactions to the invasion and had incurred medical expenses. We held the evidence supported compensatory damage awards of $500 and $200 in invasion of privacy claim when plaintiffs

presented evidence that defendant had observed them using the restroom. However, we did not indicate that plaintiffs bringing invasion of privacy claims were required to demonstrate they had incurred medical expenses as a result of the invasion.

[¶ 28.] Other courts that have been asked to review awards for compensatory damages in invasion of privacy claims have struggled in their attempts to measure damages. *See Hill v. McKinley,* 311 F.3d 899, 906–07 (8th Cir.2002)(affirming jury's award of $2,500 in compensatory damages on invasion of privacy claim); *Mitchell v. Globe International,* 817 F.Supp. 72, 74–75 (W.D.Ark.1993) (remitting compensatory damage award in invasion of privacy claim on remand from Eighth Circuit Court of Appeals with directions to substantially remit award); *Rohrbaugh v. Wal–Mart Stores, Inc.,* 212 W.Va. 358, 572 S.E.2d 881, 888 (2002) (adopting Restatement (Second) of Torts' (1977) position on damages for invasion of privacy claim and, additionally, holding that if none of the Restatement damages are proven, nominal compensatory damages are to be awarded).[3]

[¶ 29.] The *Mitchell* case involved an invasion of privacy claim based on publication of a picture of the 96–year–old plaintiff, a resident of Mountain Home, Arkansas, in a supermarket tabloid to illustrate a story about " 'Paper Gal, Audrey Wiles' in Sterling, Australia, who had become pregnant by one of her customers, a 'reclusive millionaire' she met on her newspaper route.' " *Mitchell,* 817 F.Supp. at 72. The

---

**3.** The Restatement (Second) of Torts (1977) provides that a plaintiff who has established a cause of action for invasion of privacy is entitled to recover damages for (a) the harm to his interest in privacy resulting from the invasion; (b) his mental distress proved to have been suffered if it is of a kind that

normally results from such invasion; and (c) special damage of which the invasion is a legal cause. *Rohrbaugh,* 572 S.E.2d at 887(indicating in a footnote that the majority of courts addressing the issue have adopted the Restatement's position on damages for an invasion of privacy claim).

Eighth Circuit Court of Appeals remanded that case for a substantial remittitur of compensatory damages after concluding that while the evidence supported a compensatory damage award, the amount awarded by the jury—$650,000—was shocking and exaggerated. *Id.* at 73.

[¶ 30.] In its decision remitting the compensatory damage award the federal district court believed "the Harrison, Arkansas, jury, chosen from all walks of life, was better situated to make that decision than this court[.]" It said, "This is an especially difficult task where the damages to be awarded are based on intangibles such as damage to reputation and mental suffering." *Id.* at 73. Ultimately, the court remitted the compensatory damage award to $150,000, because it believed the damages suffered by plaintiff due to the defendant's conduct were worth that much.

[¶ 31.] Additionally, in *Sabrina v. Willman*, 4 Neb.App. 149, 540 N.W.2d 364, 370–71 (1995), the Nebraska Court of Appeals addressed the issue of damages for a statutory invasion of privacy claim. The court indicated that its review of other jurisdictions revealed that the "gravamen of this tort is 'the injury to the feelings of the plaintiff, and the mental anguish and distress caused thereby.'" *Id.* at 370 (quoting *Fernandez v. United Acceptance Corp.*, 125 Ariz. 459, 462, 610 P.2d 461, 464 (Ariz.Ct.App.1980)). "Once a party has established that the defendant has intruded, the defendant is liable for damages." *Sabrina*, 540 N.W.2d at 370.

[¶ 32.] In addressing invasion of privacy claims, courts have "recognized that damages in this area can be difficult to ascertain or measure by a pecuniary standard[.]" *Sabrina*, 540 N.W.2d at 370 (citations omitted). Therefore, "[r]ealizing the difficulty in determining damages, courts have found that a trier of fact is uniquely qualified to assess damages." *Id.* The Ne-braska court concluded that in an invasion of privacy claim "the amount of damages should almost always be in the hands of the jury." *Id.* at 371.

[¶ 33.] In this case, a South Dakota jury found Farner had committed an "unreasonable, unwarranted, serious and offensive intrusion upon the seclusion of another." *See Kjerstad*, 517 N.W.2d at 424. Furthermore, the jury found the invasion at issue—the opening, reading, photocopying and dissemination of Roth's mail—was "one which would be offensive and objectionable to a reasonable man of ordinary sensibilities." *See Shope*, 286 N.W.2d at 808.

[¶ 34.] Additionally, the jury heard testimony from Roth that he felt angry, betrayed and devastated upon learning of the invasion. Roth also testified that he sought help with his feelings over the intrusion from his sponsor and friends at Alcoholic's Anonymous. Roth also testified that one of the documents in the intercepted package was a handwritten note, created upon the advice of his attorney, which documented Roth's experiences and feelings during his last few months of employment at Farner. Roth's wife testified that he was very hurt upon learning of the invasion, felt deceived and could not believe that somebody would open his mail and do that. She further testified that Roth could not sleep at night and drank a lot of coffee. Upon hearing the evidence and being instructed to fix the amount of damages based on findings of the harm to Roth's privacy interest and emotional distress suffered, the jury awarded the sum of $25,000 in compensatory damages.

[¶ 35.] Although the amount of the jury's award in this case gives us pause, we cannot say that there was no legal evidence upon which it could be based. "[T]his Court cannot 'reweigh the

evidence or gauge the credibility of the witnesses' when reviewing the jury's verdict." *Sporleder v. VanLiere,* 1997 SD 110, ¶ 27, 569 N.W.2d 8, 15 (quoting *Andreson v. Black Hills Power & Light Co.,* 1997 SD 12, ¶ 8, 559 N.W.2d 886, 888 (citations omitted)). Furthermore, we cannot say the trial court, after hearing the evidence, erred in denying Farner's motion for judgment n.o.v. or its motion for a new trial on this issue.

### D. Statements of Roth's counsel in closing argument

[¶ 36.] Farner contends that Roth's counsel made statements in closing argument that were unsupported by the evidence and intended to inflame and prejudice the jury. As a result, Farner contends a new trial is warranted.

[¶ 37.] We recognize that "counsel are allowed wide latitude in argument and that a court should not too narrowly limit the manner and form of presentation and the inferences and conclusions to be drawn from the evidence, so long as unfair means are not employed to prejudice the jury." *Binegar v. Day,* 80 S.D. 141, 151, 120 N.W.2d 521, 527 (1963). Furthermore,

> A plaintiff should not be penalized for the misstatements of his counsel and the granting of a new trial should not be used to discipline counsel. An appellate court should interfere only when from an examination of the entire record, it is convinced that there has been a miscarriage of justice.

*Id.*

[¶ 38.] During closing argument, Roth's attorney did make the statement, "I was admonished not to tell you that it's not illegal to tape record conversations and so I'm not going to tell you that" after the trial court had earlier sustained an objec-

tion to a similar remark and struck a portion of the earlier statement from the record. However, this second statement was made in rebuttal, *after* counsel for Farner had made a statement to the effect, "he puts in his pocket a tape recorder and secretly records the final conversation ... and he then wants to have you return a verdict in his favor on invasion of privacy."

[¶ 39.] Furthermore, while it is true that counsel for Roth characterized Farner's conduct as evil and its employees as a pack of jackals, counsel for Farner did not object to these statements at trial. We have previously held that such objections not properly raised at trial cannot be reviewed by this Court on appeal. *Anderson v. Johnson,* 441 N.W.2d 675, 677 (S.D.1989).

[¶ 40.] Finally, Roth's counsel made a comment in closing argument regarding defense counsel and the alleged scattering of the copies of the Pochop package throughout Roth's personnel file, to the effect "their own lawyers are in on that cover-up, and they are the ones that produced those documents to us." The record indicates that the defense objected at the time of trial, and the trial court advised the jury to "use their own recollection of what the evidence is." It is a well-settled premise of our system that a jury will use their reason in weighing the evidence and follow the instructions of the trial court. *See State v. Holzer,* 2000 SD 75, ¶ 20, 611 N.W.2d 647, 654.

[¶ 41.] Based on a review of the entire record, it cannot be said that the trial court abused its discretion in denying Farner's motion for a new trial. "[T]he trial court had the benefit of hearing the same evidence as did the jury, and of observing the jury itself for indications that passion or prejudice may have influenced their verdict." *Stormo,* 469 N.W.2d at 826 (citations omitted).

E. Amount of punitive damages award

[¶ 42.] Farner contends that the punitive damages awarded by the jury—$500,-000—are excessive and the result of passion and prejudice. Farner contends the punitive damages award violates the due process clause of the United States Constitution.

[¶ 43.] We have previously indicated that, in order to overturn a jury's award of punitive damages, "the amount 'must be so excessive as to strike mankind, at first blush, as being, beyond all measure unreasonable and outrageous, and such as manifestly shows the jury to have been actuated by passion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant[.]'" *Leisinger v. Jacobson,* 2002 SD 108, ¶ 9, 651 N.W.2d 693, 696 (quoting *Flockhart v. Wyant,* 467 N.W.2d 473, 479 (S.D.1991)).

[¶ 44.] Additionally, although states have discretion to impose punitive damages to punish and deter, "it is well established that there are procedural and substantive constitutional limitations on these awards." *State Farm v. Campbell,* — U.S. —, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003) (additional citations omitted). "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* at 1519–20. Thus, "[p]unitive damages awards must comply with the due process clause's 'general concern for reasonableness.'" *Pulla v. Amoco Oil Co.,* 72 F.3d 648, 658

(8th Cir.1995) (quoting *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 458, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366 (1993)(additional citation omitted)). Our standard of review is *de novo.*[4]

[¶ 45.] "[E]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a state may impose." *Campbell,* — U.S. at —, 123 S.Ct. at 1520 (quoting *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 1598, 134 L.Ed.2d 809 (1996)). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Campbell,* — U.S. at —, 123 S.Ct. at 1520 (citing *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 42, 111 S.Ct. 1032, 1056, 113 L.Ed.2d 1 (1991) (O'Connor, J., dissenting)).

[¶ 46.] Out of concerns that punitive damage awards may be imposed indiscriminately and may be awarded in grossly excessive amounts, the Supreme Court has developed three guideposts to assist courts in reviewing punitive damage awards:

1) the degree of reprehensibility of the defendant's misconduct,

2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and

3) the difference between the punitive damages awarded by the jury and the

---

4. In *Leisinger,* we applied an abuse of discretion standard because there was no claim that the award violated the Constitution. 2002 SD 108 at ¶ 9, 651 N.W.2d at 696. In this case, Farner contends the award violates the due process clause, therefore the standard of review is *de novo See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 435–36, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001) (indicating "the question whether a fine is constitutionally excessive calls for application of a constitutional standard to the facts of particular case, and in this context *de novo* review of that question is appropriate").

civil penalties authorized or imposed in comparable cases.

*Campbell*, —— U.S. at ——, 123 S.Ct. at 1520 *(citing Gore,* 517 U.S. at 575–86, 116 S.Ct. at 1599–1604). *See also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 440, 121 S.Ct. 1678, 1687, 149 L.Ed.2d 674, 689 (2001).

[¶ 47.] We have previously applied a five-factor test in determining whether punitive damages are appropriate or excessive, analyzing the amount allowed in compensatory damages, the nature and enormity of the wrong, the intent of the wrongdoer, the wrongdoer's financial condition, and all of the circumstances attendant to the wrongdoer's actions. *See Leisinger,* 2002 SD 108 at ¶ 19, 651 N.W.2d at 700. We herein incorporate our five factor analysis with the three guideposts outlined by the Supreme Court. *See Campbell,* —— U.S. at ——, 123 S.Ct. at 1520–26.

[¶ 48.] The first guidepost requires us to examine the "degree of reprehensibility of the defendant's misconduct." *Id.* at 1520 (citing *Gore,* 517 U.S. at 575, 116 S.Ct. at 1599). In applying this guidepost, we consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell,* —— U.S. at ——, 123 S.Ct. at 1521.

[¶ 49.] We have previously indicated that in examining the intent of the wrongdoer "we determine 'the degree of reprehensibility of the defendant's conduct,' which is viewed as probably the most important indication of the reasonableness of the punitive damage award." *Veeder v. Kennedy,* 1999 SD 23, ¶ 54, 589 N.W.2d

610, 621 (quoting *Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, ¶ 32, 552 N.W.2d 801, 812 *(Schaffer II )* (citing *Gore,* 517 U.S. at 575, 116 S.Ct. at 1599)). Under this analysis we have recognized "the principle that some wrongs are more blameworthy than others." *See Schaffer II,* 1996 SD 94 at ¶ 32, 552 N.W.2d at 811. "Trickery and deceit are more reprehensible than negligence." *Id.* (citing *Gore,* 517 U.S. at 576, 116 S.Ct. at 1599) "Of a more serious nature would be those acts which result in injury to persons through 'indifference to and reckless disregard for the health or safety of other[s].' " *Veeder,* 1999 SD 23 at ¶ 54, 589 N.W.2d at 621 (quoting *Gore,* 517 U.S. at 576, 116 S.Ct. at 1599).

[¶ 50.] In reviewing these facts as they apply to the offensiveness of Farner's conduct, we find the Eighth Circuit case of *Pulla,* 72 F.3d at 660, helpful. In *Pulla,* a co-employee examined Pulla's credit card records upon a belief that Pulla was abusing sick leave. The employee photocopied the records and forwarded them to his supervisor who in turn forwarded them to Human Resources where they were ultimately placed in Pulla's personnel file. The Eighth Circuit Court of Appeals found this conduct was of limited offensiveness and ultimately reversed the punitive damages award for failing to pass constitutional muster. In finding that the trial court misapplied the offensiveness prong to the punitive damage award, the court focused on the fact that there was no evidence that the conduct reflected a company policy or practice.

[¶ 51.] In this case, the evidence indicates that Farner's initial intrusion was not intentional. The Pochop package was opened in the ordinary course of business, it was addressed to Farner's business address and was not addressed to Roth, personally and confidentially. After the initial

inadvertent intrusion, Schmidt discovered a transcript of the termination meeting between himself, Roth and Cy Farner. He went on to read and photocopy the package and disseminated it to Farner's vice president of sales who in turn disseminated it to Farner's president. There was additional evidence that a letter from the law firm to an attorney in West Des Moines, Iowa concerning Roth's age discrimination claim was received, opened and placed in Roth's personnel file.

[¶ 52.] However, there is no evidence that the conduct reflected a company policy or practice. Farner's actions were limited to two incidents involving mail addressed to Roth at Farner's business address which was not marked personal and confidential. Farner's tortious acts grew out of one employee's conduct and his dissemination of a transcript of a tape recording of a termination meeting which had been secretly recorded and which involved that employee and the head of the company. Like the *Pulla* Court, we find this conduct of limited offensiveness "justifying a limited award of punitive damages." *Pulla*, 72 F.3d at 661.

[¶ 53.] Furthermore, although Roth contends that Farner's actions harmed his age discrimination suit, the majority of the items in the package, including the contents of the transcript of the termination meeting, were either already within the knowledge of Farner's employees or would have been discoverable by Farner in that lawsuit. Additionally, we note that Roth did not appeal the trial court's judgment on the jury verdict in favor of Farner on his age discrimination claim.

[¶ 54.] In analyzing the offensiveness of the conduct, we must look to whether the punitive damages award "jars one's constitutional sensibilities." *Id.* at 660. In this case, the harm caused to Roth was economic as opposed to physical.

Farner put no one's health or safety at risk and the evidence indicates Farner's conduct was limited to two isolated incidents. Although Farner's fraudulent concealment indicates it engaged in conduct of trickery and deceit, Roth was fully compensated for the damages he suffered as a result of Farner's invasion of his privacy. *See Campbell,* ––– U.S. –––, 123 S.Ct. at 1521, 155 L.Ed.2d 585 (indicating "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.") (citing *Gore,* 517 U.S. at 575, 116 S.Ct. 1589, 134 L.Ed.2d 809). "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.* at 1523.

[¶ 55.] Accordingly, based on the above, we find that the first guidepost, or reprehensibility guidepost, weighs in favor of a finding that the punitive damages awarded in this case were excessive and fail to meet the due process clause's "general concern for reasonableness." *Pulla,* 72 F.3d at 658.

[¶ 56.] The second guidepost requires us to consider "the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award." *Campbell,* ––– U.S. at –––, 123 S.Ct. at 1520 (citing *Gore,* 517 U.S. at 575, 116 S.Ct. at 1601). In the past, when considering "the amount allowed in compensatory damages," we have indicated "[t]he amount of punitive damages must bear a reasonable relationship to the compensatory damages." *Grynberg,* 1997 SD 121 at ¶ 38, 573 N.W.2d at 504 (additional citation omitted). However, we have also indicated ratio comparisons are of limited value and

"there is no precise mathematical ratio between compensatory and punitive damages." *Id.*

[¶ 57.] Likewise, the Supreme Court has indicated "the relevant constitutional line is 'inherently imprecise,' rather than one 'marked by a simple mathematical formula.'" *Cooper*, 532 U.S. at 434–35, 121 S.Ct. at 1684 (quoting United *U.S. v. Bajakajian*, 524 U.S. 321, 336, 118 S.Ct. 2028, 2037, 141 L.Ed.2d 314 (1998) and Gore, 517 U.S. at 582, 116 S.Ct. at 1602).

[¶ 58.] The Supreme Court recently reconfirmed this view in *Campbell*, —— U.S. at ——, 123 S.Ct. at 1524, by declining "to impose a bright-line ratio which a punitive damages award cannot exceed." However, the Supreme Court went on to indicate that "in practice, few awards exceeding a single digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.*

[¶ 59.] In this case, the mathematical ratio between punitive and compensatory damages is twenty to one. We have previously expressed concern of ratios expressing a smaller disparity. *See Leisinger*, 2002 SD 108 at ¶ 20, 651 N.W.2d at 700 (addressing 9 to 1 ratio) and *Grynberg*, 1997 SD 121 at ¶ 38, 573 N.W.2d at 505 (addressing 13–1/2 to 1 ratio). *See also Schaffer II*, 1996 SD 94 at ¶ 28, 552 N.W.2d at 810–11 (addressing 30 to 1 ratio). However, we proceed to analyze "the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages awarded." *See Campbell*, —— U.S. at ——, 123 S.Ct. at 1524 (indicating "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff").

[¶ 60.] In reviewing this guidepost, as it applies to the facts in this case, we again find the *Pulla* case helpful. 72 F.3d at 652–53. In comparing the disparity between actual and punitive damages the *Pulla* court indicated that "while a 'shocking disparity' in the ratio between an award of punitive and actual damages may suggest that the punitive damages award is unconstitutional, the existence of potential damages and/or the reprehensibility of a defendant's conduct may overcome any such disparity." *Pulla*, 72 F.3d at 659. "Moreover, not only does the presence of these factors justify a large punitive damages award, *but their absence also can counsel against a large award.*" *Id.* (emphasis added).

[¶ 61.] In finding that the trial court misapplied the harm prong to the punitive damage award, the *Pulla* court indicated that the potential harm inquiry could not overlook the actual events and focus on "potential victims of similar *hypothetical torts.*" *Pulla*, 72 F.3d at 659. Under this analysis, the court held that because Pulla had failed to produce any evidence that the defendant had put any other individual's privacy at risk, "the potential harm from the search of his credit cards" could "only be analyzed as the search affected him." *Id.* at 660.

[¶ 62.] The *Pulla* Court relied upon the United State's Supreme Court case of *TXO* in analyzing the potential harm of the tortious conduct. *See Pulla*, 72 F.3d at 659–60. In *TXO*, the United State's Supreme Court, in a plurality decision, indicated that in determining whether the punitive damage award bore a reasonable relationship to actual damages:

It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have

resulted if similar future behavior were not deterred.

*TXO,* 509 U.S. at 460, 113 S.Ct. at 2722 (emphasis in original).

[¶ 63.] Furthermore in defining the possible harm to other victims, the Court quoted with approval a passage from an opinion issued by the West Virginia Court of Appeals:

> For instance, a man wildly fires a gun into a crowd. By sheer chance, no one is injured and the only damage is a $10 pair of glasses. A jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care. We would allow a jury to impose substantial punitive damages in order to discourage future bad acts.

*Id.* at 459–60, 113 S.Ct. 2711 (quoting *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 661, 413 S.E.2d 897, 902 (1991)).

[¶ 64.] In *Pulla,* the Eighth Circuit Court of Appeals indicated that under this standard, "the touchstone is the potential harm that would have likely resulted from the dangerousness *inherent* in defendant's actual conduct." *Pulla,* 72 F.3d at 659 (emphasis added).

[¶ 65.] In applying this standard to the facts in this case there is no evidence that the conduct reflected a company policy or practice or that Farner put anyone else's privacy at risk. As a result, the dangerousness inherent in Farner's conduct, i.e., the potential harm from opening, copying and disseminating Roth's mail, must be viewed from how these actions affected Roth, personally.

[¶ 66.] As indicated above, most of the contents of the Pochop package were either in the possession of Farner and its employees or discoverable in the age discrimination cause of action. Additionally,

Roth did not appeal the judgment on the jury's verdict for Farner on his age discrimination claim. Accordingly, we find that there was an unlikelihood of serious potential harm and limited actual harm to Roth.

[¶ 67.] Therefore, applying the rationale of the *Pulla Court,* we find that in this case, the combination of the "shocking disparity" between compensatory and punitive damages awarded, combined with the lack of potential and actual harm and the low degree of reprehensibility of the defendant's conduct, counsel against a substantial punitive damages award.

[¶ 68.] Additionally, in regard to determining if the amount awarded in punitive damages is reasonable and proportionate to the amount awarded in compensatory damages, the Supreme Court has indicated that "sanctions of double, treble, or quadruple damages" may be sufficient to meet the State's goals of deterrence and retribution in imposing punitive damages against a tortfeasor. *See Campbell,* —— U.S. at ——, 123 S.Ct. at 1524. "When compensatory damages are substantial, then a lesser ratio, perhaps equal to compensatory damages can reach the outermost limit of the due process guarantee." *Id.*

[¶ 69.] In determining that a lesser ratio between compensatory and punitive damages was warranted in *Campbell,* the Supreme Court noted that, based on the substantial compensatory damage award, the Campbells were completely compensated for the economic harm caused by the defendant. *Id.* Additionally, the Supreme Court noted that the compensatory damage award, which compensated the Campbells for their emotional distress, indignation, outrage and humiliation, contained a punitive element. *Id.*

[¶ 70.] In this case, there was a substantial compensatory damage award of $25,000. The evidence indicates that Roth

suffered only minor economic injuries. Furthermore, Roth's damages, as supported by the evidence, consisted of emotional distress, including feelings of anger, betrayal and devastation. Accordingly, not only was Roth completely compensated for his economic injuries by the large compensatory damage award, but we find also that the compensatory damages in this case contained a punitive element. *See Campbell*, —— U.S. at ——, 123 S.Ct. at 1525 (quoting Restatement (Second) of Torts § 908, Comment c, p. 466 (1977) (indicating that where "compensatory damages include an amount for emotional distress, such as humiliation or indignation ... [,] there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both")).

[¶ 71.] Based on the above, we find that this second guidepost, or harm guidepost, indicates the punitive damages award was unreasonable and disproportionate to the potential harm and the actual harm experienced by Roth and a lower ratio between compensatory and punitive damages is warranted.

[¶ 72.] We have previously indicated that a defendant's net worth is a guideline for assessing the amount of punitive damages. *See Schaffer II*, 1996 SD 94 at ¶ 36, 552 N.W.2d at 813 (citation omitted). Therefore, we have held that a defendant's financial resources are an appropriate yardstick for determining punitive damages. *Id.* However, in this case, where we have determined that the reprehensibility and harm guideposts counsel in favor of a lower punitive damages award, we need not address "the wrongdoer's financial condition" and the effect of the punitive damages award on Farner. *See id.*, 1996 SD 94 at ¶ 37, 552 N.W.2d at 813 and *Grynberg*, 1997 SD 121 at ¶ 45, 573 N.W.2d at 506. "The wealth of a defen-

dant cannot justify an otherwise unconstitutional punitive damages award." *Campbell*, —— U.S. at ——, 123 S.Ct. at 1525 (citing *Gore*, 517 U.S. at 585, 116 S.Ct. at 1604).

[¶ 73.] The third guidepost calls for us to analyze "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, —— U.S. at ——, 123 S.Ct. at 1520 (citing *Gore*, 517 U.S. at 575, 116 S.Ct. at 1603). In the past, we have considered "whether there were other sanctions available, either civil or criminal," when taking into consideration "all other relevant circumstances of the case." *See Veeder*, 1999 SD 23 at ¶ 58, 589 N.W.2d at 622 (referencing *Grynberg*, 1997 SD 121 at ¶ 46, 573 N.W.2d at 507 and *Schaffer II*, 1996 SD 94 at ¶ 39, 552 N.W.2d at 814).

[¶ 74.] In this case, we note that the legislature has repealed the statute of the criminal code dealing with opening letters without authority. *See* SDCL 22–21–2, SL 1976 § 21–3. However, under federal law, knowingly and willfully obstructing the passage of mail carries a fine or imprisonment of up to six months. *See* 18 USCA § 1701. Additionally, some courts have held that 18 USC § 1708, which prohibits the theft of mail and provides for a fine or imprisonment of up to five years, applies to conversion of misaddressed mail. *See United States v. Palmer*, 864 F.2d 524, 528 (7th Cir.1988).

[¶ 75.] We conclude that both the reprehensibility and harm guideposts, as applied to the facts in this case, indicate that the punitive damages award violates the due process clause's "general concern for reasonableness." *Pulla*, 72 F.3d at 658. We recently reconfirmed our view that, "[p]unitive damages must not be so oppressive or so large as to shock the sense of fair-minded persons." *Leisinger,*

2002 SD 108 at ¶ 23, 651 N.W.2d at 701 (quoting *Schaffer II*, 1996 SD 94 at ¶ 27, 552 N.W.2d at 810). In this case, where there was a substantial compensatory damage award containing a punitive element which fully compensated Roth for the harm caused, we find "a punitive damages award at or near the amount of compensatory damages" is justified. *See Campbell,* —— U.S. at ——, 123 S.Ct. at 1526.

[¶ 76.] Therefore, we hold that the punitive damages awarded—$500,000—was unreasonable and disproportionate to the harm caused and the wrong committed. This case is remanded for a new trial on punitive damages. In order to properly calculate a punitive damage award, the jury should be instructed in accordance with this opinion regarding the three guideposts outlined by the United States Supreme Court. *See Campbell,* —— U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585. *See also Cooper,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674, *Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, and *Pulla,* 72 F.3d 648.

### F. Roth's presentation of financial information

[¶ 77.] Because we have reversed on the issue of punitive damages, we need not address this issue.

### ISSUE THREE

[¶ 78.] **Whether Roth was entitled to a jury trial.**

[¶ 79.] Farner contends that the invasion of privacy claim was improperly submitted to the jury. As indicated above, Roth brought the invasion of privacy claim after initially instituting a claim for age discrimination. Roth's original complaint alleging age discrimination did not contain a request for a jury trial. In its answer to Roth's original complaint, Farner requested a trial by jury. Roth's amended complaint, which added the invasion of privacy claim, did not contain a request for a jury trial. Farner's answer to the amended complaint did not contain a request for jury trial. Farner raised the issue at the pre-trial conference in September 2001 and Roth subsequently made a motion for jury trial which was granted by the trial court.

[¶ 80.] "The granting or denying of a jury trial is within the broad judicial discretion of the trial court and will not be disturbed absent a clear showing of abuse of discretion." *Fox v. Burden,* 1999 SD 154, ¶ 32, 603 N.W.2d 916, 924. Additionally, SDCL 15–6–38(a) provides, "[t]he right of trial by jury as declared by article VI, section 6 of the Constitution of South Dakota or as given by a statute … shall be preserved to the parties inviolate." Under SDCL 15–6–39(a), "[w]hen trial by jury has been demanded as provided in § 15–6–38, the action shall be designated upon the docket as a jury action." Finally, SDCL 15–6–39(b) provides:

> Issues not demanded for trial by jury as provided in § 15–6–38 shall be tried by the court; but, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court *in its discretion* upon motion may order a *trial by a jury of any or all issues.*

SDCL 15–6–39(b) (emphasis added).

[¶ 81.] In this case, a demand for jury trial was made in the answer to the original complaint, the case was docketed as a jury trial, and the record indicates that the parties proceeded through the pre-trial process with the understanding that the case would be tried before a jury. Based on these circumstances, we cannot say that the trial court abused its discretion in allowing the invasion of privacy claim to go to the jury.

## CONCLUSION

[¶ 82.] Affirmed in part, reversed in part and remanded.

[¶ 83.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.

[¶ 84.] CALDWELL, Circuit Judge, for SABERS, Justice, disqualified.