#23891-a-JKM

**2006 SD 92**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

KATHERINE MELSTAD,              Plaintiff and Appellant,

    v.

HARVEY M. KOVAC and
RAIDER INDUSTRIES,
INCORPORATED,                   Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE STEVEN R. JENSEN
Judge

\* \* \* \*

TERRY L. PECHOTA of
Pechota Law Office              Attorney for plaintiff
Rapid City, South Dakota        and appellant.

JAMES C. ROBBENNOLT             Attorney for defendants
Sioux Falls, South Dakota       and appellees.

JACK DER HAGOPIAN of
Der Hagopian Law Office         Attorney/lienholder
Sioux Falls, South Dakota       and appellee.

\* \* \* \*

ARGUED ON AUGUST 29, 2006

OPINION FILED **10/25/06**

#23891

MEIERHENRY, Justice

[¶1.]    Harvey M. Kovac (Kovac) and Raider Industries, Inc. (Raider) made a motion to enforce a settlement agreement of a personal injury lawsuit brought by Katherine Melstad (Melstad). Melstad claims that she did not expressly authorize her attorney, Jack Der Hagopian (Der Hagopian), to settle her negligence action against Kovac and Raider, and that the trial court erred in determining that she had authorized the settlement. We affirm.

[¶2.]    Melstad's claim sought recovery for personal injuries suffered as a result of a collision with a semi-truck near Vermillion, South Dakota on July 28, 1998. Melstad's first attorney filed suit on July 9, 2001, against Kovac, the driver of the truck, and Raider, the owner of the truck. After Melstad's first attorney withdrew because of communication difficulties, she hired Der Hagopian to represent her. Melstad and Der Hagopian entered into a written contract providing for contingent fees of one third (1/3) of the gross amount received by settlement or judgment. A jury trial was scheduled for October 5, 2004. Prior to trial, the parties tried to mediate but failed to reach a settlement. Nevertheless, they continued to negotiate. After several offers and counteroffers, the parties settled the case on the eve of trial for $325,000. However when Melstad received the written settlement agreement, she refused to sign it claiming that she had not given Der Hagopian authority to settle for that amount. Kovac and Raider then made a motion in circuit court to enforce the settlement.

[¶3.] After dismissing Der Hagopian, Melstad appeared pro se at two hearings to request continuances until she could retain new counsel.[1] She subsequently retained new counsel, and the motion to enforce the settlement was tried to the court. The evidence presented at the hearing consisted of deposition testimony of Der Hagopian, affidavits and live testimony of Melstad, along with other exhibits and affidavits submitted by the parties.

[¶4.] Based on the evidence, the trial court determined that Melstad had consented to the settlement agreement and that it should be enforced. The trial court ordered Kovac and Raider to pay Melstad $325,000 as well as Melstad's mediation fees in return for a full and complete release by Melstad of any and all further claims against Kovac and Raider arising out of the collision.

[¶5.] After enforcing the settlement agreement, the court took evidence on Der Hagopian's motion to enforce his attorney's lien. The trial court granted Der Hagopian's motion in the amount of $113,900.79, with interest running from October 4, 2004. Melstad appeals and presents the following issues:

### ISSUES

1. Whether the trial court erred by concluding that the settlement agreement was enforceable absent Melstad's written authorization.
2. Whether the trial court erred by finding that Melstad's counsel had authority to settle Melstad's case for $325,000.00.
3. Whether the trial court erred by finding that there was a meeting of the minds and mutual assent on all essential terms of the settlement agreement.

---

1. Der Hagopian had filed a motion to withdraw; however, when Melstad appeared pro se at the summary judgment motion, she informed the court that she had dismissed him as her attorney.

## STANDARD OF REVIEW

[¶6.] We review the trial court's findings of fact under a clearly erroneous standard. Under SDCL 15-6-52(a), "[f]indings of fact, whether based on oral or documentary evidence, may not be set aside unless clearly erroneous." Under this standard, "clear error is shown only when, after a review of all evidence, 'we are left with a definite and firm conviction that a mistake has been made.'"[2] Walker v. Walker, 2006 SD 68, 720 NW2d 67, 70 (quoting Midzak v. Midzak, 2005 SD 58, ¶14, 697 NW2d 733, 737-38). "[W]e are not free to retry the case as if it had never been heard before." *In re* Guardianship and Conservatorship of A.L.T. & S.J.T., 2006 SD 28, ¶37, 712 NW2d 338, 347. Therefore, the trial court's finding that Der Hagopian had express authority to settle is reviewed under the clearly erroneous standard. Conclusions of law are reviewed under a de novo standard of review and no deference is given to the trial court's conclusions of law. Credit Collection Services v. Pesicka, 2006 SD 81, ¶5, 721 NW2d 474, 477.

## DECISION

*Written Authority to Settle*

[¶7.] Melstad claims that authority to settle her claim needed to be in writing in order to be valid. In support of her argument she points to provisions in the Uniform Commercial Code and the Rules of Professional Conduct.

---

2. Melstad argues that we are required to apply a de novo standard of review because the trial judge made findings based solely on deposition testimony and documentary evidence. However, the 2000 amendment of SDCL 15-6-52(a) makes no distinction between findings based on oral evidence and findings based on documentary evidence.

[¶8.] Melstad first argues that a provision of the Uniform Commercial Code codified in SDCL 57A-1-206(1) governs the transaction and requires written authority for an attorney to settle a claim on behalf of a client. The statutory provision upon which she relies applies to the enforcement of a sale of personal property over $5000.00 in value. The statute provides as follows:

> (1) Except in the cases described in subsection (2) of this section a contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.
>
> (2) Subsection (1) of this section does not apply to contracts for the sale of goods (§ 57A-2-201) nor of securities (§ 57A-8-113) nor to security agreements (§ 57A-9-203).

SDCL 57A-1-206.

[¶9.] Melstad argues that the transaction is analogous to a sale of personal property since a cause of action is something of value and can be owned. Thus, she argues, an attorney receiving the cause of action from a client is like a sale of personal property and would fall under SDCL 57A-1-206(1), which requires the contract to be in writing. Melstad has not cited nor are we aware of any jurisdiction that has adopted this analysis. A similar argument was made and rejected in *Wende v. Orv Rocker Ford Lincoln Mercury Inc.*, 530 NW2d 92, 95 (IowaCtApp 1995). The Iowa Appellate Court determined that "the settlement of a personal injury lawsuit is not a contract for the sale of personal property, nor would it typically fall within any specific article of the commercial code." *Id.* We also decline to consider a personal injury settlement as a contract for a sale of personal property

and find no merit in Melstad's assertion that a provision in the commercial code requires an attorney to obtain a client's written authority to settle a lawsuit on the client's behalf.

[¶10.]     Melstad next contends that because Rule 1.5 (c) of the South Dakota Rules of Professional Conduct requires contingent fee agreements to be in writing, an attorney's authority to settle must also be in writing.  Melstad relies on SDCL 59-2-3, which provides, "authority to enter into a contract. . . required by law to be in writing, can only be given by an instrument in writing."[3]  SDCL 59-2-3.  Here, the key to whether the statute applies depends on which agreement constitutes the underlying contract – the settlement agreement or the contingent fee agreement. Melstad argues that the underlying contract is the contingent fee agreement.  Kovac and Raider identify the underlying contract as the settlement agreement.  Under the facts of this case, the underlying contract is clearly the settlement agreement between Melstad and defendants Kovac and Raider.  Since the law does not require personal injury settlement agreements to be in writing, it necessarily follows that a lawyer's authority to settle on behalf of a client also need not be in writing. Consequently, SDCL 59-2-3 does not apply.

[¶11.]     We have previously cautioned that getting a client's written approval to settle a case may be advisable to avoid misunderstanding and liability.

---

3.     In its entirety, SDCL § 59-2-3 requires certain forms of authority to be evidenced by a writing:  "An oral authorization is sufficient for any purpose, except that an authority to enter into a contract, other than a negotiable instrument, required by law to be in writing can only be given by an instrument in writing."

#23891

Northwest Realty Co. v. Perez, 119 NW2d 114, 116 (SD 1963). Nevertheless, we acknowledged that written authority to settle a case was not required. *Id.* Obviously, written approval would have alleviated the kind of problems found in the present case.[4] However, beyond the mere advisory language in *Northwest Realty,* no relevant statute or case law requires an attorney to obtain express written authority to settle a client's case.[5] *Cf.* Cook v. Surety Life Ins., 903 P2d 708, 717

---

4.      The American Bar Association's Law Practice Management Section recently published an article entitled, *Dealing with Difficult Clients*, which provides sound advice on ways attorneys can prevent conflicts with difficult clients. The article addressed the particularly relevant concept of documentation in the following excerpt:

> Documenting. . . means recording sufficient details to assist you in a future disagreement. The record you make is not of any use if there are insufficient details to assist you. . . . In notes and meetings or conversations with the client, be sure to record the information and advice you gave the client, not only the information the client gave you. Where there is a dispute between lawyer and client, this area may, in fact, be the biggest area of disagreement, and is also among the least documented. In litigation between the lawyer and client, where . . . that advice is not documented, courts have often preferred the evidence of the client on this issue.

Carol Curtis, *Dealing With Difficult Clients*, A.B.A. Section of Law Practice Management, April 2005, *available at* http://www.abanet.org/lpm/lpt/articles/mgt04054.html.

5.      The American Bar Association's Section on Litigation issued a publication entitled, "Ethical Guidelines for Settlement Negotiations" which reiterates the requirement that an attorney must receive a client's authorization to settle the client's case. While the Model Rules of Professional Responsibility do not specifically mandate that this authorization be in writing, the publication does suggest that "lawyers who received authorization to negotiate a settlement and enter a final agreement on behalf of their client should consult the law of the relevant jurisdiction to determine whether the client's delegation of such ultimate settlement authority must be in writing. . . ." Ethical Guidelines for Settlement Negotiations, ABA Section of Litigation

(continued . . .)

-6-

#23891

(HawCtApp 1995) (basing the requirement that an attorney obtain express written authority from a client to settle on a statute expressly requiring a writing). As in *Northwest Realty*, whether an attorney has authority to settle a client's case depends on a factual determination of the communications between them. 119 NW2d at 117. Therefore, the trial court appropriately considered the testimony and other evidence in determining whether Melstad had authorized Der Hagopian to settle her claim against Kovac for $325,000.

*Authority to Settle*

[¶12.] While an attorney "may negotiate for and advise settlement of controversy," the decision to settle belongs to the client.[6] *Id.* at 116. The client must expressly give her attorney the authority to settle, and the law of agency determines whether the attorney has received such authority. *See* Federal Land Bank of Omaha v. Sullivan, 430 NW2d 700, 701 (SD 1988); Petersen v. Petersen, 245 NW2d 285, 288 (SD 1976). Authority to enter into a contract on behalf of the

---

(. . . continued)

(2002), *available at* http://www.abanet.org/litigation/ethics/settlementnegotiations.pdf. South Dakota has adopted the Model Rules of Professional Conduct and no other relevant authority requires an attorney to obtain a client's written authorization to settle.

6. Specifically, SDCL 16-18-11 provides as follows:

An attorney and counselor at law has power to bind his client to any agreement in respect to any proceeding within the scope of his proper duties and powers; but no evidence of any such agreement is receivable except the statement of the attorney himself, his written agreement signed and filed with the clerk, or an entry thereof upon the records of the court.

principal can be created by express authorization from the principal or by the acquiescence of the principal in the actions of the agent. *See Federal Land Bank of Omaha*, 430 NW2d at 701-02; *Petersen*, 245 NW2d at 288 (stating that a client makes his attorney's unauthorized act his own by failing to disavow it at the first instance). The question before the trial court was whether Melstad had expressly authorized her attorney to settle for the final amount. After considering all the evidence, the trial court determined that she had. The trial court specifically found that Melstad gave Der Hagopian express authorization to settle for $325,000 and "only later did she change her mind and [attempt] to repudiate the settlement." Melstad contends that the trial court erred when it made that finding.

[¶13.] A review of the record supports the trial court's determination that Melstad expressly authorized her attorney to settle for the final amount. Settlement negotiations first began when the parties attempted mediation. While Melstad demanded $1,500,000, Kovac and Raider offered $125,000.[7] After Kovac and Raider increased their offer to $250,000, Melstad reduced her demand to $750,000. At the same time she advised Der Hagopian that she would go no lower than $650,000. Up to this point, Melstad and Der Hagopian agree about what transpired between them. They disagree as to the content and timing of their communications thereafter.

---

7. Evidence in the record indicates that Melstad's injuries were severe, but that issues of preexisting disease, prior accidents and contributory negligence were also raised.

[¶14.] Der Hagopian's version included a conversation two days before trial on October 3, 2004. Der Hagopian claimed that in that conversation Melstad authorized him to lower the demand to $500,000, which he then communicated to opposing counsel on the morning of October 4, 2004.[8] Der Hagopian's telephone records of October 3, 2004, showed that on that date, Der Hagopian and Melstad had spoken at least three times and his paralegal and Melstad had spoken at least seven times.

[¶15.] In order to get the other side to increase the offer, Der Hagopian testified that he convinced Melstad to let him reduce her demand to $450,000.[9] The counteroffer of $450,000 is acknowledged in a faxed letter from opposing counsel to Der Hagopian at approximately 3:15 p.m. October 4, 2004. In that same letter Kovac and Raider increased their offer to $300,000. Der Hagopian testified that he discussed the offer with Melstad and that she eventually authorized him to accept $300,000. Before accepting the offer, however, Melstad wanted Der Hagopian to make a counter offer of $325,000 plus costs of the mediation. Kovac and Raider accepted the counter offer of $325,000 plus mediation costs, which ultimately became the terms of the settlement agreement.

---

8. An October 4, 2004, fax from Der Hagopian to Melstad references Melstad's prior offer of $500,000 and then goes on to discuss the fact that Melstad had subsequently wanted to revise the $500,000 offer to include medical and legal expenses of $300,000.

9. The trial court indicated that it was unable to determine whether she had authorized the $450,000 amount. However, the trial court was able to find that she had authorized the final offer.

[¶16.] Der Hagopian subsequently contacted the clerk of courts and witnesses to inform them of the settlement. On October 5, 2004, the settlement agreement was put into writing and faxed to Kovac and Raider's counsel and Melstad. On October 7, 2005, Der Hagopian provided Melstad with the settlement papers and a release for her signature; however, she indicated that she did not know if she would sign the documents.[10] On October 18, 2004, Melstad informed Der Hagopian that she would not be signing the settlement agreement. On November 9, 2004, Der Hagopian moved to withdraw from the case and filed notice of an attorney's lien. On November 30, 2004, the trial judge entered an order releasing Der Hagopian from further representation of Melstad.

[¶17.] Melstad disputes Der Hagopian's version of their communications. She first denied speaking to Der Hagopian on October 3, 2004, which was the date Der Hagopian claimed she agreed to reduce her demand to $500,000. Her first affidavit stated that she had not talked to Der Hagopian on Sunday, October 3, 2004. However after phone records from October 3, 2004, established that numerous telephone calls took place between Melstad and Der Hagopian or his paralegal, she then changed her testimony. In a second affidavit she stated as follows:

> What I meant to say was that I had not talked with Der
> Hagopian about a new settlement amount on Sunday, October 3,

---

10. At this time, Melstad began inquiring with Der Hagopian and a Professor at the University of South Dakota School of Law about the enforceability of an unsigned settlement agreement. On October 18, 2004, Der Hagopian advised Melstad that if the trial court found the existence of a valid settlement agreement, it could be enforced.

2004. Our discussions on Sunday had to do primarily with witnesses.

She also testified briefly before the court that she had not agreed to the $325,000 settlement amount. She claims that she could not have settled for that amount because after paying her attorney's fees and past medical expenses, she would have been left with only $79,000 for future medical expenses, future wage losses, pain and suffering and loss of enjoyment of life.

[¶18.]    After considering all the evidence, the trial court found Der Hagopian's version to be more credible. The court rendered its decision at the end of the hearing and explained in detail its findings. Specifically it found Der Hagopian was "in constant communication with his client . . . by telephone and fax machine." The court made the following oral finding:

> Mr. Der Hagopian went back to [Melstad] and discussed with her the fact that defendants would not offer more than $300,000 and the Court finds from the evidence and finds Mr. Der Hagopian's testimony to be credible, that she ultimately authorized him to settle for the $300,000 in the afternoon of Monday, the 4th of October. And there was a discussion that he would go back at $325,000 and see if he could get that, but that he had authorization to settle for $300,000 from the defendants – or with the defendants on behalf of the plaintiff.

At a later hearing concerning the enforcement of the attorney's lien, the trial court specifically addressed Melstad's lack of credibility:

> [I]t has become clear to the Court through the course of these proceedings and the way that Melstad has conducted herself in Court, that Melstad's version of reality cannot be relied upon as accurate.

[¶19.]    We will not substitute our judgment for the judgment of the trial court. Having had the advantage of hearing live testimony and having had the opportunity to evaluate the credibility of the parties, the trial court was in the

-11-

better position to resolve the conflicting testimony regarding the communications between Melstad and Der Hagopian. Thus, the finding that Melstad authorized Der Hagopian to settle for $325,000 is supported by the evidence in the record and was not clearly erroneous.

*Terms of the Settlement Agreement*

[¶20.]     Melstad next contends that the trial court erred in finding there was a meeting of the minds and mutual assent on all essential terms of the settlement agreement. This contention stems from the failure to specify whether the $325,000 settlement would be partially satisfied by the $5000 that had already been paid to Melstad as a result of mediation. The trial court found that the settlement reached by the parties was for $325,000 new money in addition to Kovac and Raider paying the plaintiff's share of mediation costs.

[¶21.]     "To form a contract, there must be a meeting of the minds or mutual assent on all essential terms." Jacobson v. Gulbransen, 2001 SD 33, ¶22, 623 NW2d 84, 90. "Mutual assent refers to a meeting of the minds on a specific subject" and "does not exist 'unless the parties all agree upon the same thing in the same sense.'" Read v. McKennan Hosp., 2000 SD 66, ¶25, 610 NW2d 782, 786 (quoting SDCL 53-3-3). To determine whether there was mutual assent, "the court looks at the words and conduct of the parties." *Jacobson*, 2001 SD 33, ¶22, 623 NW2d at 90. Whether the parties had a meeting of the minds is a question of fact. *Id.* Therefore, the trial court's finding will be reviewed under the clearly erroneous standard and great deference will be given to the trial court's determination that an agreement existed between the parties. *In re* Estate of Neiswender, 2003 SD 50, ¶14, 660 NW2d 249,

-12-

257. The trial court determined that a valid settlement agreement existed between the parties giving Melstad $325,000 plus the costs of mediation in exchange for a full release executed by Melstad.

[¶22.] "Minor points implementing the agreement, though not listed, can be implied as necessary to carry out the terms of the agreement." *In re* Estate of Eberle, 505 NW2d 767, 770 (SD 1993). Although the agreement did not specify whether the $325,000 was partially satisfied by the previous $5000 payment, the parties did mutually assent to the essential terms of the agreement. The trial court considered the deposition testimony of Der Hagopian, the settlement agreement, and the communications between the parties in reaching its finding that the $325,000 was to be new money. Thus, the trial court's finding of mutual assent to the material terms of the settlement agreement was based on the words and conduct of the parties and was not clearly erroneous.

[¶23.] Melstad raises one final issue with regards to Der Hagopian's attorney's lien. She contends that the trial court's ruling to enforce the lien was premature because the enforceability of the settlement agreement was on appeal. In light of our holding to affirm the trial court's enforcement of the settlement agreement, Melstad's argument is without merit.

[¶24.] Affirmed.

[¶25.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.