#28967, #28989-aff in pt & rev in pt-PJD
**2021 S.D. 15**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THOMAS R. WRIGHT,                                  Plaintiff and Appellee,

     v.

CURTIS TEMPLE,                                     Defendant, Third-Party
                                                Plaintiff and Appellant,

and

KEN MERRILL,                                       Third-Party Defendant and
                                                Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE HEIDI LINNGREN
Judge

\* \* \* \*

KENNETH E. BARKER
Belle Fourche, South Dakota                        Attorney for plaintiff
                                                and appellee.

TERRY L. PECHOTA
Rapid City, South Dakota                           Attorney for defendant, third-
                                                party plaintiff and appellant.

KATELYN COOK of
Gunderson, Palmer, Nelson
   & Ashmore, LLP
Rapid City, South Dakota                           Attorneys for third-party
                                                defendant and appellee.

\* \* \* \*

ARGUED
APRIL 21, 2020
OPINION FILED **03/03/21**

#28967, #28989

DEVANEY, Justice

[¶1.]　　　In this suit involving damage caused to an airplane, the owner of the plane, Thomas Wright, obtained a jury verdict against Curtis Temple for negligence, breach of contract, and deceit.  The jury awarded Wright $34,144.84 in damages on each claim.  The jury further found Temple liable to his flight instructor, Ken Merrill, for breach of contract, deceit, and fraud, but the jury did not award Merrill any damages.  The circuit court entered a judgment in favor of Wright for $102,434.52 plus prejudgment interest and costs.  Temple appeals, asserting the circuit court erred in allowing service by publication, in instructing the jury on damages, and in entering a judgment with duplicative damages.  Temple further contends the evidence is insufficient to sustain the jury's verdict in favor of Wright on the breach of contract and negligence claims.  By notice of review, Wright asserts the circuit court erred in denying his motion to submit his punitive damages claim to the jury.  We affirm in part, reverse in part, and remand on the issue of damages.

## Factual and Procedural Background

[¶2.]　　　Thomas Wright owned a 1978 Citabria airplane that he inherited from his father.  Wright housed the plane in a hangar at Black Hills Aero in Spearfish, South Dakota.  Ted Miller owns and operates Black Hills Aero.  Wright authorized Miller to rent the airplane for an hourly fee and to sell the plane.[1]  Prior to the

---

1.　　Wright's breach of contract claim is based upon an agency theory, in that Miller at all times was acting as Wright's agent.  None of the parties disputed this theory or requested jury instructions as to this issue.

accident in question, Wright listed the plane for sale in a trade publication for $75,000.

[¶3.]     Curtis Temple is a rancher residing within the Pine Ridge Indian Reservation.  He wanted to purchase an airplane and learn to fly so he could observe and count the cattle on his ranch.  Temple was not a licensed pilot and had never taken flying lessons, but his property contained a hangar and a dirt runway.  At some point Temple learned that the Citabria was for sale at Black Hills Aero, and Temple contacted Miller to express interest in purchasing it.

[¶4.]     In June 2014, Temple met Miller at Black Hills Aero to see if the Citabria would be suitable for use on his ranch.  Temple brought along Denny Kauer, a pilot and friend whom Miller knew as a customer of Black Hills Aero.  Miller explained to Temple that in order to fly the plane, Temple needed to employ a licensed pilot and obtain insurance for the plane.  According to Miller, he had also told Temple to employ Bob McNew as a flight instructor because McNew was covered by the insurance Wright carried on the plane.  Both McNew and Miller were listed as authorized pilots on Wright's insurance policy.  Temple did not recall any conversation with Miller about obtaining insurance or the requirement that he fly with McNew.

[¶5.]     Temple requested that Miller allow Kauer to fly the plane to Temple's ranch.  Miller's ordinary practice for renting Wright's airplane was to have the interested party fill out a written agreement and provide proof of insurance.  However, Miller explained that he allowed Kauer and Temple to leave with Wright's plane without any agreement in writing because Temple was a potential

buyer, and Miller knew that Kauer owned an airplane and had insurance covering any airplane that he flew.

[¶6.]     While the plane was at Temple's ranch, Miller called Temple on more than one occasion to discuss the sale of the plane and to ask Temple whether he had obtained insurance. According to Miller, Temple told him he was looking for or getting quotes on insurance policies. Temple claimed no recollection of these conversations. Miller explained that although it was apparent to him that Temple had not yet obtained insurance, he allowed Temple to keep the plane while contemplating whether to buy it because he believed Temple would be flying with McNew, who was covered under Wright's insurance policy.

[¶7.]     However, rather than contacting McNew for instruction, Temple contacted Ken Merrill, an experienced pilot and instructor with approximately 15,000 hours of flight experience, including 4,000 hours as an instructor. Merrill agreed to provide flight instruction to Temple during their first meeting at Temple's hangar on July 2, 2014. According to Merrill, he told Temple that in order to fly with him, Temple needed to obtain insurance on the airplane. Merrill contacted an insurance agent in Fargo, North Dakota, to provide Temple a quote. Merrill gave the agent Temple's contact information so that the quote could be sent directly to Temple. Merrill then began instructing him.

[¶8.]     Merrill instructed Temple on at least six occasions starting on July 2, 2014, and documented each flight in his pilot's log. Prior to their third flight, when Merrill determined Temple was ready to start assuming some control of the airplane, Merrill asked Temple whether he had obtained insurance. According to

Merrill, Temple assured him that he had. Temple, however, testified that he did not recall this conversation. It is undisputed that Temple did not obtain insurance.

[¶9.]       In mid-July, Merrill left on vacation for a week. When he returned, Merrill learned that Temple had flown with McNew while he was away. Merrill also noticed that the windsock on Temple's runway was missing. Temple explained to Merrill that during a flight with McNew, they had veered off the runway and struck the windsock, causing some minor damage to the plane. The damage was repaired the same day at Black Hills Aero, and although McNew's insurance would have covered the cost of this damage, Temple paid for it himself.

[¶10.]      Merrill continued to instruct Temple after his return from vacation, and on July 25, 2014, the accident at issue occurred. According to Merrill, Temple had control of the plane while taxiing down the runway and during the takeoff process. The plane had two in-line seats, where the student would sit in the front and the instructor behind. Each seat had full controls including throttle, rudder, and brakes. As they attempted takeoff, Merrill noticed the plane was not accelerating as it should. It appeared to Merrill that Temple had not applied full throttle, which should have been done at the end of the runway before takeoff. Merrill, believing there was sufficient time to reach airspeed, made the quick decision to apply full power. However, the plane did not reach the necessary airspeed and it crashed into a ravine at the end of the runway, causing considerable damage to the plane.

[¶11.]      Merrill explained at trial that during the taxiing process, both the rudder and the brakes are used to keep the airplane straight. But during takeoff,

the brakes are not used because that would interfere with the application of the throttle to reach full power in order to achieve airspeed. Although he could not see or feel whether Temple was applying his brakes, Merrill concluded that Temple's application of the brakes was the only explanation for why the airplane did not gain sufficient acceleration. Merrill testified that in hindsight, he should have aborted the takeoff. However, he maintained that if Temple had not had his feet on the brakes, they would have had sufficient runway space to reach airspeed. Temple, on the other hand, denied using the brakes during takeoff and maintained that Merrill, as the instructor, had ultimate control of the plane.

[¶12.] Following the accident, Merrill called the insurance agent to whom he had referred Temple to report the accident. The agent advised Merrill that there was no insurance coverage because "Temple had never sent a check." The airplane was then transported to Black Hills Aero where it was later repaired. Meanwhile, Wright called Temple multiple times, identifying himself as the owner of the airplane and requesting compensation, but each time he called, Temple hung up.

[¶13.] After Wright's attempts to obtain compensation from Temple were unsuccessful, he decided to bring suit against him. Wright's attorney initially mailed a summons and complaint to Temple's attorney to see if Temple would sign an admission of service, but Temple's attorney advised that he could not arrange service upon Temple. On December 1, 2014, Wright filed his summons and complaint alleging that he suffered damages resulting from Temple's negligence. Over the course of the next year and a half, Wright's attorney made several attempts to personally serve Temple, all of which were unsuccessful. During this

same timeframe, Temple's attorney mailed to Wright's counsel a motion to dismiss and answer, alleging insufficient service of process, but counsel did not file this document with the circuit court.

[¶14.] On May 3, 2016, Wright moved for service by publication and the circuit court granted his motion. Wright's summons was published in the Lakota Country Times, a newspaper in Martin, a town which borders the Pine Ridge Indian Reservation, for four consecutive weeks starting on June 2, 2016. Wright thereafter amended his complaint, adding claims of breach of contract, promissory estoppel, deceit, fraud, and conversion, and requesting punitive damages.

[¶15.] On August 3, 2017, Temple filed the motion to dismiss and answer that was previously sent to Wright's counsel. Therein, he alleged insufficient service of process and lack of subject matter and personal jurisdiction. However, before requesting a ruling by the circuit court on his motion to dismiss, Temple filed further pleadings, including a motion to file a third-party complaint against Merrill for negligence and for contribution from Merrill in the event Temple were to be found liable for damages.[2] After the circuit court granted Temple's motion to file a third-party complaint, Merrill filed an answer and included a counterclaim against Temple for negligence, deceit, fraud, breach of contract, and promissory estoppel. Merrill also sought punitive damages from Temple.

---

2. The record does not contain a ruling on Temple's motion to dismiss; however, Temple later moved for summary judgment in part on his claim that he was not validly served. The circuit court held that Temple had waived his claim that service was invalid by filing his answer and third-party complaint.

[¶16.]    A three-day jury trial commenced on February 20, 2019. At the close of Wright's case-in-chief, the circuit court ruled that the punitive damages claims would not be submitted to the jury. In closing argument related to non-punitive damages, Wright requested that the jury award $106,607.10 in total damages. In a special verdict form, the jury found Temple liable to Wright on the claims of negligence, breach of contract, and deceit, and awarded an identical damage amount of $34,144.84 on each claim. The jury did not find Merrill to be a joint tortfeasor, and instead found Temple liable to Merrill for breach of contract, deceit, and fraud. However, the jury did not award any damages to Merrill.

[¶17.]    Temple filed a post-trial motion for judgment as a matter of law, or in the alternative, sought a new trial, alleging many of the same issues he now raises on appeal. The circuit court denied Temple's motion but resolved a dispute between the parties as to the total amount of the judgment. Temple had asserted that the total judgment should be $34,144.84, arguing that the court could not aggregate amounts awarded on each claim, while Wright had argued that the amounts awarded on each separate claim should be added together to arrive at the total award. The court agreed with Wright, and entered a judgment in the amount of $102,434.52, plus prejudgment interest and costs.

[¶18.]    Temple appeals, raising multiple issues that we combine and restate as follows:

1. Whether the circuit court erred in allowing service by publication.

2. Whether there was sufficient evidence to support the jury's verdict finding that Temple breached a contract between Temple and Wright.

3.    Whether there was sufficient evidence to support the verdict finding that Temple was negligent.

4.    Whether the circuit court erred in instructing the jury on damages and in determining the total award.

By notice of review, Wright challenges the circuit court's denial of his motion to submit his punitive damages claim to the jury.

## Analysis and Decision

### 1.    *Whether the circuit court erred in allowing service by publication.*

[¶19.]    Temple contends the circuit court erred in concluding that Wright made the requisite showing of due diligence to justify service by publication. He asserts that all reasonable means to serve him were not exhausted. In support of his argument, Temple points to the fact that he has lived in the same location his entire life and claims he was never gone from his home while service was being attempted. Temple suggests that personal service could have been accomplished if Wright had employed a tribal process server familiar with the area where Temple lived.

[¶20.]    "Proper service of process is no mere technicality: that parties be notified of proceedings against them affecting their legal interests is a 'vital corollary' to due process and the right to be heard." *Spade v. Branum*, 2002 S.D. 43, ¶ 7, 643 N.W.2d 765, 768 (citation omitted). To ensure proper service, our statutes specify the means upon which service is to be made. *Id.* ¶ 8. Relevant here, SDCL 15-9-13 provides that a circuit court may authorize service by publication "pursuant to § 15-9-7 where the defendant, being a resident of this state, has departed therefrom with intent to defraud his creditors or to avoid the service of a summons

or keeps himself concealed therein with like intent." Under SDCL 15-9-7, "[a] summons . . . may be served by publication under the conditions and in the manner hereinafter provided and in §§ 15-9-8 to 15-9-21, inclusive." The statute further provides:

> Where the person on whom the service of the summons, writ, order, or decree is to be made cannot, after due diligence, be found within the state and that fact appears by affidavit to the satisfaction of the court or a judge thereof, and it in like manner appears that a cause of action exists against the defendant in respect to whom the service is to be made or that he is a proper party to an action relating to real or personal property in this state, or to the writ, order, or decree, such court or judge may grant an order that the service be made by publication of the summons in any of the cases described in §§ 15-9-8 to 15-9-15, inclusive.

*Id.*

[¶21.]     We have explained "that, in a case where a defendant cannot be found, a court must be satisfied, before it exercises its discretion to order service by publication, that a plaintiff has used due diligence in the attempt to locate and personally serve a defendant." *Spade*, 2002 S.D. 43, ¶ 11, 643 N.W.2d at 769. "The test of the sufficiency of the showing of due diligence is not whether all possible or conceivable means of discovery are used, but rather it must be shown that all reasonable means have been exhausted in an effort to locate interested parties." *Ryken v. State*, 305 N.W.2d 393, 395 (S.D. 1981) (citing *Davis v. Kressly*, 78 S.D. 637, 641, 107 N.W.2d 5, 7 (1961)). While the validity of service of process is a question of law, *see Spade*, 2002 S.D. 43, ¶ 6 n.1, 643 N.W.2d at 768 n.1, we review a circuit court's decision to allow service by publication for an abuse of discretion, *see Davis*, 78 S.D. at 641, 107 N.W.2d at 8.

[¶22.] From our review, Wright's affidavit of counsel in support of his motion for service of process by publication shows that exhaustive efforts were made to serve Temple. As related in the affidavit, Wright first attempted to serve Temple through the Shannon County Sheriff, then tried to hire a person he believed to be a process server on the Pine Ridge Indian Reservation. Despite numerous phone calls and written correspondence, neither of these individuals would respond to Wright's requests. In early June 2015, Wright employed a process server who made several efforts to contact Temple. He was able to make contact with Temple by phone, and Temple instructed him to give the papers to his attorney, but the attorney did not return the process server's phone call. After Temple continued to refuse the process server's requests to meet in person, the process server obtained directions to Temple's ranch and descriptions of Temple's vehicles from a private investigator. The process server located these vehicles on three occasions, but each time the vehicle sped away and he was not able to make contact. Then, on August 19, 2015, the process server went to Temple's ranch with three witnesses and was able to hand the legal papers to Temple's hired hand. Finally, after further fruitless attempts at service by two other individuals, one of whom resides on the Pine Ridge Indian Reservation, Wright moved the court for service by publication on May 3, 2016 when it became apparent Temple was concealing himself to avoid service of process. In light of the above, the circuit court did not abuse its discretion when it ordered service by publication.[3]

---

3. Although not argued or briefed by the parties, it is also clear from the record that Temple submitted to the circuit court's jurisdiction by seeking leave

(continued . . .)

> **2.** ***Whether there was sufficient evidence to support the jury's verdict finding that Temple breached a contract between Temple and Wright.***

[¶23.] Temple's argument on this issue, at the outset, appears to conflate concepts relating to breach of contract and deceit by asserting a factual argument that "there was never any consent or misrepresentations by Temple regarding insurance on the airplane or coverage through a specific instructor." He then references several cases discussing principles of contract law, starting with the premise that the existence of a valid contract and the interpretation of a contract are questions of law. However, at no point below did Temple request that the circuit court determine as a matter of law whether a valid contract existed or whether the contract was ambiguous and required interpretation by the court. These basic principles of contract law do not, therefore, relate to Temple's expressed argument on appeal, which is instead a factual attack on the sufficiency of the evidence to support the jury's determination that Temple breached his contract with Wright.

[¶24.] Temple's primary argument appears to be that there was no evidence of consent or a meeting of the minds to establish the existence of a contract and a resulting breach. He recognizes that a contract can be oral or implied, but he asserts that "there was no evidence Temple agreed to or consented" to obtain insurance or to fly with a specific flight instructor.

---

(. . . continued)
    from the court to file a third-party complaint against Merrill before obtaining a ruling on his motion to dismiss for lack of service, thus waiving any personal jurisdiction claim. *See Grajczyk v. Tasca*, 2006 S.D. 55, ¶ 11, 717 N.W.2d 624, 628, 628.

[¶25.] One of the elements that must exist for a contract to be enforceable, is mutuality of consent. *See Inst. of Range & Am. Mustang v. Nature Conservancy*, 2018 S.D. 88, ¶ 25, 922 N.W.2d 1, 8 (citation omitted). To show consent, "there must be a meeting of the minds or mutual assent on all essential terms." *Arrowhead Ridge I, LLC v. Cold Stone Creamery*, 2011 S.D. 38, ¶ 11, 800 N.W.2d 730, 734 (quoting *Melstad v. Kovac,* 2006 S.D. 92, ¶ 21, 723 N.W.2d 699, 707). "'Mutual assent refers to a meeting of the minds on a specific subject' and 'does not exist unless the parties all agree upon the same thing in the same sense.'" *Id.* (quoting *Melstad*, 2006 S.D. 92, ¶ 21, 723 N.W.2d at 707).

[¶26.] Further, "[a] contract is either expressed or implied." SDCL 53-1-3. "A contract is implied in fact where the intention as to it is not manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction." *Setliff v. Akins*, 2000 S.D. 124, ¶ 12, 616 N.W.2d 878, 885 (quoting *Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 841 (S.D. 1991)). Therefore, if the objective facts reveal that "a party voluntarily indulges in conduct reasonably indicating assent[,] he may be bound even though his conduct does not truly express the state of his mind." *Id.* ¶ 13 (quoting *Weller*, 477 N.W.2d at 841).

[¶27.] Finally, as a general premise, the "existence of a valid contract is a question of law." *Koopman v. City of Edgemont*, 2020 S.D. 37, ¶ 14, 945 N.W.2d 923, 926 (quoting *Behrens v. Wedmore*, 2005 S.D. 79, ¶ 20, 698 N.W.2d 555, 566). "If in dispute, however, the existence and terms of a contract are questions for the

fact finder." *Id.* ¶ 14, 945 N.W.2d at 927 (quoting *Behrens*, 2005 S.D. 79, ¶ 20, 698 N.W.2d at 566). Therefore, given the disputed facts here, whether the parties reached a meeting of the minds was a question of fact for the jury to decide. *See Melstad*, 2006 S.D. 92, ¶ 21, 723 N.W.2d at 707.

[¶28.] In our review of the sufficiency of the evidence supporting a jury verdict, "[w]e are not to speculate or query how we would have viewed the evidence and testimony, or what verdict we would have rendered had we been the jury." *Knecht v. Evridge*, 2020 S.D. 9, ¶ 37, 940 N.W.2d 318, 329 (alteration in original) (quoting *Roth v. Farner-Bocken Co.*, 2003 S.D. 80, ¶ 25, 667 N.W.2d 651, 661). Rather, we determine whether "there [is] any legal evidence upon which the verdict can properly be based, and [whether] the conclusions embraced in and covered by [the verdict were] fairly reached[.]" *Id.* (alterations in original) (quoting *Roth*, 2003 S.D. 80, ¶ 25, 667 N.W.2d at 661).

[¶29.] During the trial, Temple testified that he was not aware of any agreement to use a particular instructor and did not recall discussions regarding insurance. In stark contrast, Miller testified that although he did not have Temple sign a written contract, he explained to Temple that he must obtain insurance and employ McNew as an instructor in order to take the plane. Merrill likewise testified that he told Temple he needed insurance coverage for the plane, and Merrill even went a step further by calling an insurance company to obtain a quote for Temple.

[¶30.] The jury was entitled to rely upon both the words and conduct of the parties, including whether Temple's conduct in taking and flying the plane, subject to the outlined terms, indicated his assent to these terms. The jury performed its

duty in weighing conflicting evidence and determining the credibility of the witnesses.  In viewing the evidence and the inferences drawn therefrom in a light most favorable to the verdict, there was sufficient evidence to support the jury's verdict finding Temple had breached a contract with Wright.

### 3. Whether there was sufficient evidence to support the verdict finding that Temple was negligent.

[¶31.]    Temple argues that he could not as a matter of law be found negligent because he "was not in control of the Citabria and had no duty in its operation[.]" He cites a federal aviation regulation[4] and several cases relating to airplane crashes (none of which were cited to the circuit court) to support his assertion that a student pilot flying with a licensed instructor has no duty with regard to the piloting of the aircraft.

[¶32.]    Although Temple solicited trial testimony from McNew that the federal aviation regulation states that the pilot in command of an airplane is responsible for the operation of the aircraft, Temple never argued to the circuit court that a student pilot is exempt from any duty with respect to operating an airplane as matter of law.  Rather, Temple relied upon McNew's testimony to argue to the jury that Merrill was the pilot in command of the plane and, therefore, only Merrill's actions or inactions during the flight in question should be the basis of a negligence claim.

---

4.    See 14 C.F.R. § 91.3(a) (2019) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.").

[¶33.]     On appeal, Temple now cites several cases involving airplane crashes, in addition to the federal aviation regulation, to purportedly support his argument that he was not in control of the Citabria and had no duty in its operation. However, because Temple failed to raise the question of legal duty before the circuit court, we decline to consider it on appeal. *See Howlett v. Stellingwerf*, 2018 S.D. 19, ¶ 18, 908 N.W.2d 775, 781 (noting that the failure to bring an argument to the circuit court's attention ordinarily waives it on appeal).

[¶34.]     To the extent Temple is challenging the sufficiency of the evidence to support the jury verdict finding that he was negligent, we note that "[i]f the jury's verdict can be explained with reference to the evidence, rather than by juror passion, prejudice or mistake of law, the verdict should be affirmed." *Morrison v. Mineral Palace Ltd. P'ship*, 1999 S.D. 145, ¶ 14, 603 N.W.2d 193, 197 (citation omitted). Further, we examine "the evidence and testimony in a light most favorable to the verdict[.]" *See Stensland v. Harding Cnty.*, 2015 S.D. 91, ¶ 12, 872 N.W.2d 92, 96 (citation omitted).

[¶35.]     "Negligence is the failure to exercise the ordinary care which a reasonable person would exercise under similar conditions." *Ritter v. Johnson*, 465 N.W.2d 196, 199 (S.D. 1991). Therefore, "[t]he central issue in the ordinary negligence case is whether the defendant has deviated from the required standard of reasonable care . . . ." *Papke v. Harbert*, 2007 S.D. 87, ¶ 17, 738 N.W.2d 510, 516 (citation omitted).

[¶36.]     Here, the jury was instructed on ordinary negligence via the pattern civil jury instructions regarding a failure to use reasonable care under facts similar

to those shown by the evidence.[5] At trial, Merrill explained that Temple, who by the day of the crash had flown several times and had received several flight instruction sessions from both Merrill and McNew, was in control of the airplane during taxiing and takeoff. Merrill further testified that after it became apparent to him that the airplane was not accelerating as it should during takeoff, he assumed joint control of the airplane and applied full throttle in an attempt to achieve flight speed. Merrill opined that the only explanation for the failure to achieve airspeed was that Temple's feet were on the brakes—contrary to Merrill's instructions as to what must be done during takeoff. Temple, on the other hand, testified that he did not apply the brakes and was not in control of the airplane during the attempted takeoff.

[¶37.] It is "within the province of the jury as the ultimate trier of fact" to "weigh the conflicting evidence or decide upon the credibility of the witnesses." *LDL Cattle Co., Inc. v. Guetter*, 1996 S.D. 22, ¶ 19, 544 N.W.2d 523, 527. Here, while there is conflicting evidence whether Temple's actions during takeoff were negligent, the jury resolved that issue against Temple. The jury also found that Merrill was not negligent, which shows that the jury weighed the evidence and determined the credibility of the witnesses. We conclude the evidence, viewed in a light most favorable to the jury's verdict, supports the jury's determination that Temple was negligent.

---

5.  Temple proposed the pattern instructions on negligence. He also proposed instructions on contributory and comparative negligence and assumption of the risk. The circuit court declined to give these instructions, and Temple has not alleged that the court erred by refusing them.

**4.** ***Whether the circuit court erred in instructing the jury on damages and in determining the total award.***

[¶38.]     Temple argues the circuit court's instructions on the issue of Wright's damages were inaccurate, confusing, and failed to properly state the applicable law in light of the facts presented.  It is well settled that the "court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a [circuit] court's decision to grant or deny a particular instruction under the abuse of discretion standard." *Carlson v. Constr. Co.*, 2009 S.D. 6, ¶ 6 n.1, 761 N.W.2d 595, 597 n.1 (quoting *Papke*, 2007 S.D. 87, ¶ 13, 738 N.W.2d at 515).  "However, no court has discretion to give incorrect, misleading, conflicting, or confusing instructions: to do so constitutes reversible error if it is shown not only that the instructions were erroneous, but also that they were prejudicial." *Id.* (quoting *Papke*, 2007 S.D. 87, ¶ 13, 738 N.W.2d at 515).  "[W]hen the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo." *Id.* (citation omitted).  Under de novo review, "we construe jury instructions as a whole to learn if they provided a full and correct statement of the law." *Id.* (quoting *Papke*, 2007 S.D. 87, ¶ 13, 738 N.W.2d at 515).

[¶39.]     At trial, Wright offered testimony as to the fair market value of the Citabria, which he was qualified to do as the owner of the property. *See Behrens*, 2005 S.D. 79, ¶ 65, 698 N.W.2d at 580 (providing that a property owner is qualified to testify to the value of his property).  Wright testified that his father bought the airplane in 1978 for $23,000.  Prior to the accident in question, the plane had been repaired on two occasions, once in the 1980s and again after the plane failed to pass

its annual inspection in 2009. It was then essentially rebuilt during the 2012 to 2013 timeframe, at a cost of approximately $100,000, and after this rebuild, the plane was described as "better than new." Wright opined that prior to the 2014 crash, the Citabria was worth $75,000, which was the sale price for which he had listed it in the trade publication.

[¶40.] Wright further testified that after the crash, he elected not to recoup the salvage value of the plane (estimated to be from $2,000 to $4,000) and instead decided to repair it, at a cost of approximately $79,000. According to Miller, it would have cost $260,000 to buy a new Citabria. Wright conceded that after the repair, the fair market value of the plane was still at least $75,000. Nevertheless, Wright testified that after considering the money he had already spent on the plane, along with the annual maintenance and hangar costs that would continue to accrue, he decided to "stop the bleeding" and accepted the first offer that came along. While the plane was still being repaired, another rancher who had recently wrecked his own plane told Miller he wanted to buy Wright's plane as a replacement. Wright sold the plane to this rancher for $52,500.

[¶41.] Temple did not offer independent testimony regarding the fair market value of the plane prior to or after the 2014 crash. Nevertheless, through cross-examination of Wright and Miller, Temple established that no offers were made to purchase the plane at the $75,000 price. He then argued that Wright's estimated value was too high. Temple further supported this argument by eliciting testimony that comparable planes listed at a similar price did not have as many flight hours or the history of prior damage like Wright's airplane did.

[¶42.]    Under SDCL 21-2-1, the measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." We have said that "the ultimate purpose behind allowance of damages for breach of contract is to place the injured party in the position he or she would have occupied if the contract had been performed, or to 'make the injured party whole.'" *Stern Oil Co., Inc. v. Brown*, 2018 S.D. 15, ¶ 16, 908 N.W.2d 144, 151 (quoting *Ducheneaux v. Miller*, 488 N.W.2d 902, 915 (S.D. 1992)). "For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." SDCL 21-3-1. In addition to these claim-specific measures, there are general principles governing damage to property that apply to both contract and tort claims. *See* SDCL ch. 21-1 (actions for damages generally). Although Wright was entitled to pursue alternative legal theories and seek damages, given the facts here, the damages he sought under either theory were the same.[6]

[¶43.]    In pretrial submissions, the parties proposed different instructions on the issue of damages. Wright proposed what was ultimately given to the jury as Instruction 34, and Temple proposed what became Instruction 35. Instruction 35 is based upon South Dakota Civil Pattern Jury Instructions (PJI) 50-00-10 (basic

---

6.    In fact, Wright prepared only one damage exhibit calculating his damages and never suggested to the jury that a different amount of damages would be appropriate for one claim versus another.

damages instruction), as well as 50-20-10 and 50-20-20 (damages instructions for injury to property). Instruction 35 stated:

> If you decide for Wright on the on the [sic] question of negligence, you then fix the amount of money which will reasonably and fairly compensate Wright for any of the following elements of loss or harm suffered in person or property proved by the evidence to have been legally caused by Temple's conduct, whether such loss or harm could have been anticipated or not, namely:
>
> Reasonable compensation for damage to Wright's property, determined by the lesser of two measurers [sic]:
>
> (1)    The difference between the fair market value of the property immediately before the occurrence and immediately after the occurrence; or
>
> (2)    The reasonable expense of making any necessary repairs to the damaged property, plus the difference, if any, in the fair market value of the property immediately before the occurrence and its fair market value immediately after repair
>
> (3)    Whether any of these elements of damages have been proved by the evidence is for you to determine. Your verdict must be based on the evidence and not upon speculation, guesswork or conjecture.

[¶44.]      In contrast, Instruction 34 borrows concepts contained in PJI 50-70-10 (measure of general damages for breach of contract) in its introductory paragraphs, but the remainder of this instruction simply restates Wright's specific request for damages, which was set forth in an exhibit Wright introduced as part of his case in chief. Instruction 34 stated:

> The measure of damages in this case is the amount of damages which, in the ordinary course of things, would be likely to result from Temple's conduct.
>
> Damages which are not clearly ascertainable in both their nature and origin are unrecoverable. If you decide for Wright on the issue of breach of contract you must award him the amount

-20-

of money which will reasonably and fairly compensate Wright for the conduct of Temple. Wright claims his damages are:

1.    The cost of repairing the damage done to Wright's airplane [sic] July 25, 2014 in order to prepare the airplane for sale;

2.    The market value of Wright's airplane immediately prior to the damage which it sustained on July 25, 2014;

3.    Expenses for lease of a hangar to store the airplane.

*You should then subtract the amount that Wright recovered from the sale of his airplane from the total amount of the damages you have calculated according to this instruction.*

It is up to you to decide whether Wright has proved these damages. Temple denies these claims for damages.

(Emphasis added.)

[¶45.]    In settling instructions, Wright argued that both instructions were proper, suggesting that Instruction 34 provided the proper measure of damages for his breach of contract claim, while Instruction 35 provided the measure of damages for the negligence claim. Temple objected to Instruction 34. He argued that it did not set forth the proper measure of damages under any theory, and that it simply recapped Wright's requested damages as set forth in an exhibit Wright had presented to the jury. Temple further argued that directing the jury to arrive at two different awards under separate theories of the case for the *same* claimed damages would result in a duplicative recovery or "double dipping" contrary to established case law. *See Nelson v. WEB Water Dev. Ass'n, Inc.*, 507 N.W.2d 691, 696 (S.D. 1993) (a plaintiff "may not recover damages twice for the same injury simply because he pleads two legal theories—one in contract and one in tort"). Temple argued instead that Instruction 35 was the proper instruction for damages resulting from injury to property regardless of whether the damages arose from a

contract or tort claim. Over Temple's objection, the circuit court nevertheless gave both instructions.

[¶46.] From our review, there are several problems with Instruction 34.[7] First, unlike Instruction 35, it did not include the general measure of property damage encompassed in SDCL 21-1-6 (difference in fair market value before and after the event in question) and, instead, only provided the alternative measure of damages, which appears to be based upon the cost of repair plus depreciation.[8] Second, it fails to include the limiting term "reasonable" when referring to the cost of repair, a concept born out of the case law which is the genesis of this alternative

---

7. In contrast, Instruction 35 is an accurate statement of the law. It is based on SDCL 21-1-6 (stating the measure of damage to property is generally the market value of the property at the time it was damaged) and a body of case law discussing the proper measure of damages to property in contract, tort, and criminal cases. *See, e.g.*, *State v. Martin*, 2006 S.D. 104, 724 N.W.2d 872 (proper measure of restitution damages based on civil damages statutes); *Joseph v. Kerkvliet*, 2002 S.D. 39, 642 N.W.2d 533, *superseded on other grounds by rule,* SDCL 19-19-103 (in auto accident negligence cases, "the proper measure of damages is the cost of repairs and the value of its use during the time it is being repaired" (citation omitted)); *Stucker v. Travelers Indem. Co.*, 77 S.D. 27, 84 N.W.2d 566 (1957) (under an automobile collision policy, "the proper measure of damages is the difference between the fair cash value of the automobile before and after the accident").

   By limiting a damage award to the lesser of the two measures of damages, Instruction 35 also embodies the concept in SDCL 21-1-5 that "no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides . . . ."

8. Whether alternative measures of property damage are given depends on the facts of each case, not upon the legal theory underlying the damage claim. In cases where there are supporting facts, instructions on both measures of damage are "complimentary to the other" and should be given so that the jury can apply the facts and, as instructed, award the lesser of the two. *See Casper Lodging, LLC v. Akers*, 2015 S.D. 80, ¶ 40, 817 N.W.2d 477, 491. This result is in keeping with the principle that a party should not be placed in a better position than prior to the occurrence at issue.

measure of damages. Third, and perhaps most problematic, is the italicized paragraph above, which directed the jury to subtract the amount Wright received from the sale of the plane—purportedly to arrive at an amount representing the diminution in value of the plane after repair—despite the fact Wright had conceded at trial that he sold the plane for an amount *below* its fair market value. Subtracting this amount received from the subsequent sale would have reduced the offset and artificially increased the damage amount. It was up to the jury, as the finder of fact, to determine the fair market value of the plane both before and after the crash based upon the evidence received at trial.

[¶47.] Therefore, not only was Instruction 34 inconsistent with Instruction 35, it contained a measure of damages that is not supported under the law. By only providing the measure of damages based on cost of repair plus depreciation, Instruction 34 directed the jury to apply a measure of damages that may not be appropriate when the cost of repair exceeds either the fair market value of the plane or the diminution in its value after the crash. *See Joseph v. Kerkvliet*, 2002 S.D. 39, ¶ 10, 642 N.W.2d at 536, *superseded on other grounds by rule*, SDCL 19-19-103 (referring to cost of repair as the appropriate measure of damages when the vehicle could be repaired "*at a cost less than its full market value*" (emphasis added)); *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 27, 827 N.W.2d 55, 66 (restoration costs may only be recovered "*if that amount does not exceed the diminution in value of the property*" (emphasis added)); *Ward v. LaCreek Elec. Ass'n*, 83 S.D. 584, 593, 163 N.W.2d 344, 349 (1968) (citing a prior holding "that the measure of damages is the reasonable cost of restoration, *unless such cost is greater than the diminution in*

*value . . .* in which case the difference in market value before and after the injury would be the proper measure of damages" (emphasis added) (citation omitted)).

[¶48.] Finally, we must examine whether Instruction 34 was prejudicial. "To be prejudicial, the erroneous instruction must have in all probability produced some effect upon the verdict and be harmful to the substantial rights of a party." *Walter v. Fuks*, 2012 S.D. 62, ¶ 16, 820 N.W.2d 761,766.

[¶49.] Here, in addition to incorrectly instructing the jury on damages, the circuit court provided the jurors a special verdict form directing that they enter a separate damage amount associated with each claim under which they found Temple liable. But a separate damage amount for each claim was unnecessary and unsupported by Wright's theory of liability, which contemplated alternative theories of recovery for a single injury. In closing argument, Wright's counsel essentially conceded this fact by explaining to the jury that Wright was not entitled "to get double damages," which he described as an award of $106,000 for contract damages and $106,000 for negligence damages. However, counsel further suggested to the jury, "How you fill in the damages portion is up to you. Again, without being unduly repetitive, it's just that it has to come to the amount that we're requesting and not more." This illustrates the potential confusion stemming from the directive in the special verdict form that the jury award a separate damage amount under each claim.

[¶50.] The circuit court's subsequent decision to aggregate the three separate but identical awards of $34,144.84 for a total damage award of $102,434.52 highlights the prejudice resulting from Instruction 34. By interpreting the jury's

verdict as it did, the circuit court endorsed the idea that the jury could permissibly award Wright more than what the plane was worth (according to Wright's own testimony) before the accident. Such a measure of damages is contrary to the principle that a party should not be placed in a better position than prior to the occurrence at issue. Therefore, from our review of the instructions as a whole and the resulting damage award, Temple was prejudiced by the court's erroneous instruction.

[¶51.]     Merrill, however, asks that in the event we find prejudicial error regarding the instructions, we use our "power to modify the judgment to comply with the measure of damages supported by the instructions" rather than remand the case for a new trial. Under SDCL 15-26A-12, we have the power to "reverse, affirm, or modify the judgment or order appealed from[.]" While we have previously modified damage awards in other cases, we cautioned that the "modification of a judgment, especially a money judgment, is to be used sparingly and only 'when the record and evidence is such that *such judgment may be rendered with confidence* in the reasonableness, fairness, and accuracy of the decision.'" *Biegler v. Am. Family Mut. Ins. Co.*, 2001 S.D. 13, ¶ 39, 621 N.W.2d 592, 604 (emphasis added) (citation omitted).

[¶52.]     Here, the parties directly impacted by the judgment have a fundamental dispute over what amount constitutes an appropriate damage award under the facts in this case. Temple maintains that the judgment should be modified to reflect a total damage award of $34,144.84, but he has failed to show how this amount would be in accord with the proper measure of damages afforded

by law.[9]  Wright, on the other hand, requests that we sustain the $102,434.52 damage award entered by the circuit court as compensation "for all of the harm Temple caused him, but not more."  However, Wright agreed at oral argument that in the event this Court finds this amount to be erroneous as a matter of law, the appropriate remedy would be to remand for a new trial on damages.

[¶53.]      The circumstances in this case are unlike those in *Biegler*, where there was no dispute between the parties as to the amount of compensatory damages at issue and, therefore, no likelihood that the result would be different upon a remand for a new trial.  *Id.* ¶¶ 38–39, 621 N.W.2d at 603–04.  Because it appears the jury relied upon an incorrect measure of damages, it is not so easy to ascertain what damage award the jury would have rendered had it not been given inconsistent and erroneous instructions.  Moreover, the facts necessary to determine damages here were disputed.  For example, whether the amount Wright spent on repairing the plane was "reasonable" is dependent on the fair market value of the plane prior to and after the crash—amounts that are disputed by the parties.  This Court would have to engage in factfinding to arrive at a damage award that is reasonable, fair, and accurate.  Therefore, we are unable to modify the judgment with confidence.  As such, a new trial on the limited issue of damages is required to allow the finder of fact to apply the proper law when determining the compensation due to Wright.

---

9.    Temple contends the circuit court misinterpreted the verdict when it determined the jury intended to award Wright $102,434.52.  Temple asserts that by doing so, the court impermissibly awarded Wright duplicative damages by aggregating the amounts awarded on each claim when the damages were the same regardless of the different legal theories under which they were awarded.  However, given our disposition remanding the case for a new trial on damages, it is not necessary to resolve this issue.

**5.** ***Whether the circuit court's denial of Wright's motion to submit the punitive damages claim to the jury was clearly erroneous.***

[¶54.] By notice of review, Wright argues the circuit court erred by failing to submit his request for punitive damages to the jury. In support of his argument, Wright points to the court's submission of both the deceit and fraud claims to the jury and asserts that punitive damages are recoverable in cases of deceit or fraud. He further contends that the jury's finding that Temple committed deceit is "tantamount" to a finding that Temple "disregarded his civil obligations," and therefore, this finding should have entitled the jury to also consider Wright's claim for punitive damages.

[¶55.] Whether a request for punitive damages may be submitted to a jury is governed by SDCL 21-1-4.1:

> In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.

In applying this statute, we have explained that "[t]he proponent [of a punitive damage claim] bears a burden of demonstrating a 'reasonable basis' to believe punitive damages are warranted." *Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419, 425 (S.D. 1994) (quoting *Vreugdenhil v. First Bank of S.D.*, 467 N.W.2d 756, 760 (S.D. 1991)). "In other words, the proponent must prove a 'prima facie case' for punitive damages." *Id.* (quoting *Flockhart v. Wyant*, 467 N.W.2d 473, 475 (S.D. 1991)). The burden set forth in SDCL 21-1-4.1 "is a preliminary, lower-order quantum of proof than must be established at trial." *Fluth v. Schoenfelder Constr.*,

*Inc.*, 2018 S.D. 65, ¶ 31, 917 N.W.2d 524, 534 (quoting *Case v. Murdock*, 488 N.W.2d 885, 891 (S.D. 1992)).

[¶56.] Here, the circuit court properly recognized that Wright's theories of liability derived primarily from two independent claims: (1) that Temple breached a contract by failing to use a particular instructor and failing to insure the plane consistent with the parties' agreement, and (2) that Temple was negligent in operating the plane on the day of the accident. As to the second claim, Wright did not, and could not, argue that Temple's negligent conduct in damaging the plane provided a basis for punitive damages because a claim for punitive damages requires a showing of malicious or willful conduct beyond mere negligence. *See Smizer v. Drey*, 2016 S.D. 3, ¶ 20, 873 N.W.2d 697, 703 (observing that malice "is not presumed simply from doing [an] unlawful or injurious act"). As to his first claim, Wright failed to present any facts showing an independent tort, other than negligence, that was separate and distinct from a breach of contract.

[¶57.] Punitive damages "are not ordinarily recoverable in actions for breach of contract, because, as a general rule, damages for breach of contract are limited to the pecuniary loss sustained." *Grynberg v. Citation Oil & Gas Corp.*, 1997 S.D. 121, ¶ 17, 573 N.W.2d 493, 500 (quoting *Hoffman v. Louis Dreyfus Corp.*, 435 N.W.2d 211, 214 (S.D. 1989)). Although Wright also brought a deceit claim, punitive damages may only be awarded on a deceit claim when the party seeking them "can prove an independent tort that is separate and distinct from the breach of contract." *Id.* ¶ 18. "While the independent tort . . . may arise out of the same transaction, it is not committed merely by breaching the contract, even if such act is intentional."

*Id.* (citation omitted). Because torts arise out of a legal duty, the question becomes whether such duty is "born of that wider range of legal duty which is due from every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud." *Id.* ¶ 21, 573 N.W.2d at 501 (emphasis omitted) (citation omitted). Thus, our focus must be "on whether a legal duty exists independent of the obligations under the contract." *Id.* ¶ 22.

[¶58.] Wright's breach of contract, deceit, and fraud claims were all based upon an alleged agreement (contract claim) or a representation (deceit and fraud claims) by Temple that he had "the insurance coverage necessary to operate the airplane with Merrill acting as his instructor." Even though both the deceit and fraud claims required a willful or intentional act by Temple, they were not independent torts because the misrepresentation alleged here did not arise out of a "duty due from every man to his fellow," *see id.* ¶ 21, but rather arose strictly from the alleged contractual obligation. Therefore, the circuit court did not err refusing to submit the punitive damages claim to the jury.[10]

[¶59.] Affirmed in part, reversed in part, and remanded for a new trial on the issue of damages.

[¶60.] JENSEN, Chief Justice, and KERN and SALTER, Justices, and GILBERTSON, Retired Chief Justice, concur.

---

10. Despite the denial of Wright's request to submit his punitive damages claim to the jury, the circuit court did allow the jury to consider Wright's fraud and deceit claims, along with his contract claim. On remand, the circuit court should enter a judgment conforming with our determination that no independent tort of deceit existed here.

[¶61.]      MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.